IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,

      Plaintiff,

v.                               No. CIV 15-00472-RB/KK

STEVE ELMORE, STEVE ELMORE
PHOTOGRAPHY, INC., d/b/a STEVE ELMORE
INDIAN ART, and d/b/a SPIRIT BIRD PRESS,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 5). Plaintiff President and Fellows of Harvard College (Harvard) and Defendant Steve Elmore contracted to publish a book through the Peabody Museum Press (the Press). (Doc. 22-1 at 1.) When Harvard later decided not to publish the book, Mr. Elmore published it through Spirit Bird Press, a subsidiary of Steve Elmore Indian Art. (Doc. 13-1 ¶¶ 21–22.) Harvard sued Mr. Elmore, alleging copyright infringement, breach of contract, and false designation of origin. (Doc. 1 at ¶¶ 43–64; *see also* Doc. 17 at 44–65 (amending Complaint to include Steve Elmore Photography, Inc., d/b/a Steve Elmore Indian Art, and d/b/a Spirit Bird Press (collectively "Mr. Elmore"). Harvard also filed a Motion for Preliminary Injunction to enjoin Mr. Elmore "from further advertising, selling, offering for sale, distribution, or other exploitation" of his book. (Doc. 5 at 25.) The Court held a hearing on this matter on December 7, 2015. (Doc. 53.)

Having reviewed the parties' submissions and arguments, the Court **GRANTS** in part and **DENIES** in part Harvard's Motion for Preliminary Injunction (Doc. 5).

## I.      BACKGROUND

Mr. Elmore and Harvard contracted to publish a book, provisionally titled *In Search of Nampeyo: the Apprenticeship of a Great Hopi Artist*.  (Ex. 10 at 1.)  Pursuant to a "Letter of Agreement," signed by both parties, the book would discuss "selected pieces of pottery" in Harvard's Keam collection, held by the Peabody Museum of Archaeology and Ethnology (the Museum).  (*Id.*)  Mr. Elmore agreed to "write and deliver to [the Press] . . . a complete manuscript (electronic and hard copy; including front matter, text, bibliographic references, copies of illustrations, and figure captions) . . . ."  (*Id.*)  Mr. Elmore was to "work in consultation with the Museum and the Press to select objects from the collection for illustration in the volume" and to "obtain any necessary permissions for the use of material owned by others . . . ."  (*Id.*)  The Museum was to "handle all photography and produce any other needed artwork for the volume."  (*Id.*)  The agreement further provided that "Harvard shall be considered the 'author' of the Work" and Mr. Elmore agreed "to grant, assign, and transfer to [Harvard] all publication rights to the manuscript and book, including all rights of copyright."  (*Id.* at 2.)  Harvard also agreed to reimburse Mr. Elmore for expenses to visit the Museum for research.  (*Id.*)

In planning his research visit to the Museum, Mr. Elmore contacted Ms. Joan O'Donnell, the Director of Publications for the Museum.  (Exs. 10; 11 at 2.)  Mr. Elmore asked Ms. O'Donnell if he could "speak with the photographer" about arranging the pottery for photographs for the book during his visit (Ex. 11 at 2); however, Ms. O'Donnell informed Mr. Elmore that a photographer would not be available until the manuscript was accepted (Ex. 11 at 1).  Instead, Ms. O'Donnell suggested Mr. Elmore take "record shots" to reflect his desired

pottery arrangements.  (*Id.*)  She confirmed with the Keam Collection that Mr. Elmore could take "record shots for [himself] and the photographer" and emailed Mr. Elmore a form entitled "Permission to Photograph Collections" (Photograph Agreement).  (Ex. 12, 13.)

The Photograph Agreement provided that any use of his personal photographs, other than non-commercial uses enumerated in the agreement, required "prior written permission of the Museum and [would] be governed by the photographic policies of the Peabody Museum and Harvard University."  (Ex. 2.)  One of the enumerated uses in the agreement was the "circulation of pre-publication research materials to colleagues . . . ."  (*Id.*)  The agreement further provided that if Mr. Elmore breached the agreement, he would pay Harvard $10,000 as liquidated damages and that Harvard could enforce "all other remedies available at law or in equity."  (*Id.*)  When Mr. Elmore visited the Museum, he provided a signed copy of the Photograph Agreement before visiting the collection.  (*See id.*)

Harvard requires the Photograph Agreement because it believes that "[i]t is extremely important to the Museum to have control over and approval of any published photographs of its collections, because the quality of those photographs and the way they are presented reflect directly on the Museum, and either enhance or degrade its reputation."  (Doc. 6 at 1.)  The Photograph Agreement refers to "photographic policies of the Peabody Museum and Harvard University," which were available online when Mr. Elmore received the agreement.  (*Id.* at 2.)  The policy states, "In rare circumstances, the Museum will allow a researcher to publish his or her own photograph of a Peabody Museum object.  The procedure for seeking permission involves a review of the photograph quality and the transfer of copyright for that photo to the Peabody Museum."  (*Id.*)  The Museum conditions approval of photographs for publication upon proper attribution of both the artifact and the picture.  (*Id.* at 3; Schneiderman Test. in Dec. 7,

2015 Hr'g.)   Harvard requires the caption underneath each photograph to include a "gift statement" indicating how Harvard acquired the artifact, a copyright statement, a number identifying the individual artifact, and a number identifying the actual image.   (*Id.*; Ex. 3 (depicting correct attribution on the picture on the left side).)   Harvard requires this information to allow future researchers to find the object in the Museum's vast collections.   (Schneiderman Test. in Dec. 7, 2015 Hr'g.)

Mr. Elmore submitted several chapters (Ex. J) and then two draft manuscripts (Exs. F, G) to the Press.   Both of the drafts were reviewed by the Press's Editorial Advisory Board and additional unnamed manuscript readers.   (Docs. 1 ¶ 26; 22 at 13.)   In these versions of the manuscript, Mr. Elmore included many photographs he had taken during his visit to the Museum (*see, e.g.*, Ex. F at 105, Ex. J at 1), images from another Press publication, *Historic Hopi Ceramics* (*see, e.g.*, Ex. F at 94), and a photograph from the Museum's website (*compare* Ex. F at 123 *with* Ex. 5; Ex. 6).   *Historic Hopi Ceramics* has a registered copyright.   (Ex. 8)   During review of the drafts, Ms. O'Donnell reminded Mr. Elmore photography would not be done until "a manuscript has been submitted, peer reviewed, and revised."   (Ex. 13.)   Ms. O'Donnell suggested that Mr. Elmore "use record shots/photocopies as placeholders for what [Mr. Elmore] want[ed] illustrated."   (*Id.*)

After reviewing Mr. Elmore's second draft, Harvard declined to publish the manuscript. (Ex. 16.)  In a letter, dated January 21, 2014, Harvard "return[ed] to [Mr. Elmore] all rights in the manuscript . . . , including all versions of the manuscript submitted to [the Press]."   (*Id.*)  The Press recommended that Mr. Elmore "find a magazine or trade publisher that specializes in Southwest Indian art to publish the work" and further offered to provide Mr. Elmore, "without charge, 10 to 15 high-quality, existing Peabody photographs to use in such publication."   (*Id.*)

Mr. Elmore decided to publish his manuscript, entitled *In Search of Nampeyo: The Early Years, 1875–1892*, through Spirit Bird Press, a subsidiary of Steve Elmore Indian Art.  (Doc. 13-1 ¶¶ 21–22.)  Mr. Elmore did not contact Harvard for any additional photographs, and instead used photographs he had taken during his visit to the Museum (*id.* at ¶ 19), images based on the photographs in *Historic Hopi Ceramics* (*id.* at ¶26–27), and at least one photograph taken from the Museum's website (Ex. 16).  Although most of these images were included in versions of the manuscript provided to Harvard for review, at least one was not.  (Elmore Test. in Dec. 7, 2015 Hr'g (stating he did not use the same image of the "Jack-in-the-box" artifact for the manuscript submitted to Harvard that was eventually used in the published book); *compare* Supp. Ex. 1 at 177 *with* Defense Ex. J at 1 (showing a different image of the "Jack-in-the-box" artifact).)  The images based on *Historic Hopi Ceramics* are line drawings, which Mark Diederichsen created by tracing over the photographs, filling in the tracings with three selected colors, and then erasing the photographs.  (Diederichsen Test. in Dec. 7, 2015 Hr'g.)  By filling in the patterns with the three colors, Mr. Diederichsen eliminated the photograph's original gray scale.  (*Id.*)

Mr. Elmore's published book ("the book") contains various captions for the images. Most of Mr. Elmore's photographs include a figure number identifying the figure's order in the book, a brief description of the figure, and state "Keam Collection."  (*See, e.g.*, Supp. Ex. 1 at 76–82, 85–86.)  Others lack any information on the source of both the image and the artifact (*see, e.g.*, *id.* at 90, 138) and still other photographs state "Peabody" after the description (*see, e.g.*, *id.* at 141, 149–54).  The captions below the *Historic Hopi Ceramics* illustrations note that the pottery depicted is "in the Keam Collection."  (*See, e.g.*, *id.* at 124–25, 131, 135.)  In some copies of the book, Mr. Elmore included a separate, paper "Addendum," which stated that the "photographs and illustrations [are] courtesy of the Peabody Museum of Archaeology and

Ethnology." (Schneiderman Test. in Dec. 7, 2015 Hr'g; Def.'s Closing Arg. in Dec. 7, 2015 Hr'g.) The Addendum lists both Mr. Elmore's photographs and the illustrations based on *Historic Hopi Ceramics*, and provides identification numbers for the artifacts, but not the pictures. (Ex. 4.) Some of the identification numbers are incorrect and several figures are missing. (*Id.*)

Harvard learned of Mr. Elmore's plans to publish the book on January 8, 2015. (Ex. 17.) On June 4, 2015, Harvard filed suit alleging copyright infringement, breach of contract, and false designation of origin. (Doc. 1 at ¶¶ 43–64; *see also* Doc. 17 at 44–65.) Harvard alleges that the book contains over 100 unauthorized photographs of pottery in Harvard's Keam collection, 50 copyright protected images from *Historic Hopi Ceramics*, and falsely attributes photographs and illustrations to Harvard. (Doc. 17 at ¶¶ 1, 6, 8.) After filing suit, Harvard contacted Amazon to cease sales of the book on amazon.com. (Doc. 46-2.) On June 17, 2015, Harvard filed a Motion for Preliminary Injunction to enjoin Mr. Elmore "from further advertising, selling, offering for sale, distribution, or other exploitation" of the book. (Doc. 5 at 25.) Harvard also seeks, among other relief, "liquidated damages of $10,000 for each personal photograph published" and statutory damages pursuant to 17 U.S.C. § 504(c). (Doc. 17 at 14–15.)

Mr. Elmore has sold eight hundred copies of his book thus far (*see* Closing Arg. in Dec. 7, 2015 Hr'g), even though it appears that Amazon has discontinued sales (*see* Doc. 37 at 8 ("Pursuant to the DMCA's Notice and Takedown procedure, Amazon stopped selling Mr. Elmore's infringing book"). After the book was published, a researcher from New Mexico visited the Museum and requested to view Hopi ceramics. (Schneiderman Test. in Dec. 7, 2015 Hr'g.) The researcher objected to signing the Photography Agreement because he thought that the Museum could not have made Mr. Elmore sign the Photography Agreement. (*Id.*)

Approximately three hundred researchers visit the Museum every year and about ninety-five percent of them request to take pictures of the artifacts.  (*Id.*)

## II.    DISCUSSION

### A.  Requirements for Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008).   A preliminary injunction is an extraordinary remedy never awarded as of right.  *Id.* at 22.   In order to secure a preliminary injunction, movants must prove that all four equitable factors weigh in their favor.  *Beltronics USA, Inc. v. Midwest Inventory Distrib.*, LLC, 562 F.3d 1067, 1070 (10th Cir. 2009).  Any "right to relief must be clear and unequivocal."  *Id.* (quoting *Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)).

Three types of preliminary injunctions are "specifically disfavored . . . (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005).  To achieve a disfavored injunction, the movant must satisfy a "heightened burden of showing that the traditional four factors weigh heavily and compellingly in its favor."  *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

### B.  Disfavored Injunctions

#### i.  Status Quo

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .' "  *Schrier*, 427 F.3d at 1258

(internal quotations removed).  Consequently, preliminary injunctions that alter the status quo "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* at 1259 (internal quotations removed).

However, the "status quo" can mean different things in different circumstances. *See* 11A Charles Alan Wright et al., Federal Practice and Procedure (3d ed.) (discussing preliminary injunctions to prevent the defendant from changing existing circumstances to harm the plaintiff, to require the defendant to restore a situation changed by the defendant after the plaintiff moved for a preliminary injunction, and to "compel defendant to correct injury already inflicted").  In cases where a defendant has already inflicted damage, the status quo is the " 'last peaceable uncontested status existing between the parties before the dispute developed.' "  *Schrier*, 427 F.3d at 1260 (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948, at 136 (2d ed. 1995)).  Courts determine the status quo by looking to "the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Id.*

In *Schrier*, the movant had been fired from his position, allegedly in retaliation for public comments regarding an issue of public concern.  *Id.* at 1257.  The court determined that the last uncontested status was before the movant was fired.  Practically, at that point, the movant was still employed, and thus his request to be reinstated sought "to preserve rather than disturb the status quo, regardless of whether or not he [was] legally entitled to such reinstatement."  *Id.* at 1260.  Similarly, in *Dominion Video Satellite, Inc.*, the court considered a contract dispute where the movant sought to restore service that had been discontinued pursuant to a new interpretation of its criteria.  *Dominion Video Satellite, Inc.*, 269 F.3d at 1155.  The court determined that the last time the situation was uncontested, the service was provided based on the old interpretation

of the criteria.  *Id.*  Thus, the court determined that "[e]ven if [the service provider] had the *legal* right under the contract to refuse [service] . . . the *reality* was that" the service provider had delivered service regardless of that legal right.  *Id.*  In both cases, the court "declin[ed] to extend the definition of the status quo to invariably include the last status immediately before the filing for injunctive relief."  *Id.*

Here, the last time the situation was uncontested was when Mr. Elmore was under contract with Harvard and he had agreed not to publish any photographs he had taken at the Museum (Doc. 1-1).  Once Harvard refused to publish Mr. Elmore's work, Mr. Elmore believed he could publish the photographs included in the returned manuscript.  (*See* Doc. 13-1 ¶ 18.) Harvard, however, did not share that belief.  (*See* Doc. 7 ex. D (stating Harvard's interpretation that although the rights to the manuscript were returned, permission to use the images had not been granted).)  Thus, the reality between the parties at the last peaceable situation was that Mr. Elmore had not yet published his book.  As such, the request to enjoin Mr. Elmore from selling his book does not disrupt the status quo.

### ii.     *Mandatory or Prohibitory Injunction*

"Mandatory injunctions are more burdensome than prohibitory injunctions because they affirmatively require the nonmovant to act in a particular way and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction."  *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991) *overruled on other grounds by O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).   In *SCFC ILC, Inc.*, the court determined that the preliminary injunction was mandatory because it required the nonmovant to manufacture and deliver new cards to customers, even though no substantial supervision would be required by the court.  *Id.* at 1098.  Similarly, in *Schrier*, the court determined the preliminary

injunction was mandatory because reinstating an employee was an affirmative requirement, and retaining the employee may have placed the court in a position where it may have had to provide supervision. *Schrier*, 427 F.3d at 1261; *see also Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 746 F.2d 816, 830 n.21 (D.C. Cir. 1984) (describing the distinction between mandatory and preliminary injunctions as whether the status quo is a "condition of action" or a "condition of rest"). Conversely, in *Dominion Video Satellite, Inc.*, the court determined that the preliminary injunction was not mandatory because it merely prohibited the nonmovant "from refusing to activate new . . . customers on the same terms and conditions previously applicable" and did not compel the nonmovant "to do something it was not already doing during the last uncontested period preceding the injunction." *Dominion Video Satellite, Inc.*, 269 F.3d at 1155.

In this case, Harvard requests that Mr. Elmore be required to do something he was not already doing before he published his book. *See id.* Restraint on sales requires more of Mr. Elmore than simply ceasing sales of his book in his gallery. Mr. Elmore will also have to take affirmative action to ensure that no existing outlets continue to sell his book. This requires a "condition of action." *See Friends for All Children, Inc.,* 746 F.2d at 830 n.21. The Court will have to supervise the action to insure that Mr. Elmore contacts all outlets to cease sale. *See Schrier*, 427 F.3d at 1261. Consequently, the injunction is mandatory and therefore requires a higher burden for relief.

### iii.    *Substantially All Relief Sought*

Courts scrutinize preliminary injunctions more closely if they provide the movant with "substantially all the relief he may be entitled to if he succeeds on the merits." *Id.* Such injunctions run the risk of allowing the " 'Sentence first—Verdict Afterwards' type of procedure parodied in Alice in Wonderland." *SCFC ILC, Inc.*, 936 F.2d at 1099.

Here, however, Harvard claims substantially more than merely restraining Mr. Elmore from selling his book.  Notably, Harvard seeks, "liquidated damages of $10,000 for each personal photograph published."  (Doc. 17 at 14.)  Even if Harvard only recovers $10,000 for failure to "restrict [his] use of the photographs as set forth" in the agreement, such damages are not inconsequential.  Moreover, Harvard also may recover statutory damages pursuant to 17 U.S.C. § 504(c).  (Doc. 17 at 14–15.)  Since Harvard asserts Mr. Elmore falsely identified the origin of more than 100 of his personal photographs and 50 copyrighted images from *Historic Hopi Ceramics* (Doc. 5 at 7, 9), such damages may be significant.  Given the large amount of additional damages alleged, the preliminary injunction is not "substantially all the relief" to which Harvard may be entitled.  *See SCFC ILC, Inc.*, 936 F.2d at 1099.

## C.  Substantial Likelihood of Success on the Merits

To establish substantial likelihood of success on the merits, the movant must show that success is probable.  *Amoco Oil Co. v. Rainbow Snow*, Inc., 809 F.2d 656, 661 (10th Cir. 1987).

### i.  Breach of Contract

When considering state law claims, federal courts apply the choice of law rules of the forum state.  *See Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 802 (10th Cir. 1998) (discussing diversity jurisdiction).  For contract claims, New Mexico generally applies the law of "the place where the contract was executed."  *Shope v. State Farm Ins. Co.*, 1996-NMSC-052, 122 N.M. 398, 400.  Ambiguities in a contract are construed against the drafter, *Smith v. Tinley*, 1984-NMSC-011, 100 N.M. 663, 665; however, to be ambiguous, a contract must be "reasonably and fairly susceptible to different constructions."  *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, 299 P.3d 844, 852 (internal quotations and alterations omitted).

Mr. Elmore signed the Museum's Photography Agreement, which stated "I agree that the photographs made by me at [the Museum] are solely for my own personal research use. *No such*

*photographs . . . will be publicly exhibited . . . or reproduced . . . .*"  (Ex. 2 (emphasis added).)

The agreement listed five exceptions for "legitimate research purposes," which included

"circulation of pre-publication research materials to colleagues."  (*Id.*)  Other than these

exceptions, the agreement stipulated "any other use of these photographs will require the prior

written permission of the Museum and shall be governed by the photographic policies of [the

Museum] and Harvard University."

The parties do not dispute the ambiguity of this contract; however, Mr. Elmore claims

that the letter declining to publish the manuscript provided the "written permission of the

Museum" necessary to publish his photographs of the Keam collection.  (Ex. 2).  In the letter

declining publication, the Museum "return[ed] to [Mr. Elmore] all rights in the manuscript 'In

Search of Nampeyo: the Apprenticeship of a Great Hopi Artist,' including all versions of the

manuscript submitted to the Peabody Museum Press."  (Ex. 16.)  The original agreement

provided that a manuscript consisted of "electronic and hard copy; including front matter, text, . .

. copies of illustrations, and figure captions . . . ."  (*Id.*)

The original agreement unambiguously outlines the procedures for obtaining permission

to use images in the manuscript.  For existing photographs, the agreement provided that Mr.

Elmore would "obtain any necessary permissions for the use of material owned by others . . . ."

(*Id.*)  For new photographs, the Museum was to "handle all photography and produce any other

needed artwork for the volume."  (Ex. 10 at 1.)  Prior to submitting his manuscript, Mr. Elmore

had not obtained permission to use material owned by others and the Museum had not provided

rights for any other photography in the manuscript.  Even by Mr. Elmore's account, Harvard's

permission to use his photographs in the final publication depended on whether the photographs

made "the final cut for the published book."  (Doc. 22 at 5.)  All such photographs remained

"placeholders" until such approval had been granted.  (*See* Ex. 13 ("In your manuscript, you should use record shots/photocopies as placeholders for what you want illustrated.").)  When Harvard "returned" the rights in the manuscript to Mr. Elmore, it only returned the rights that existed at the time Mr. Elmore submitted the manuscript.  Since Mr. Elmore never obtained approval "in the final cut" to use the photographs in the manuscript, there were no rights in the photographs for Harvard to "return" in the letter declining to publish.  The original contract was not ambiguous and the letter declining publication transferred only the rights already existing in the manuscript versions.

In addition, at least one image exists that was never included in any version of the manuscript.  (Elmore Test. in Dec. 7, 2015 Hr'g (stating he did not use the same image of the "Jack-in-the-box" artifact for the manuscript submitted to Harvard that was eventually used in the published book); *compare* Supp. Ex. 1 at 177 *with* Defense Ex. J at 1 (showing a different image of the "Jack-in-the-box" artifact).)  Even if the letter declining publication granted rights to publish all photographs in any versions of the manuscript submitted to Harvard, this would not include any photographs that did not exist in any versions of the manuscript.  Mr. Elmore has asserted no defense for his use of this image.

Thus, Harvard's "success is probable" regarding its breach of contract claim.  *See Amoco Oil Co.*, 809 F.2d 656 at 661.

### ii. *Copyright Infringement for Images Similar to* Historic Hopi Ceramics

"[T]o establish infringement, two elements must be shown: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original."  *Feist Publications, Inc. v. Rural Tel. Serv. Co. Inc.*, 499 U.S. 340, 361 (1991).  A certificate of registration from the U.S. Copyright Office can establish prima facie evidence of a valid copyright.  *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005).

However, a defendant may refute this prima facie evidence by establishing that "the works in question were not entitled to copyright protection." *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008).

Even if a work is copyrighted, the copyright may not protect "every element of the work." *Feist Publications, Inc.*, 499 U.S. at 348.  Copyrights only protect "original works of authorship . . . ."  17 U.S.C. § 102.  The requirement for originality "seeks to strike a delicate balance—rewarding (and thus encouraging) those who contribute something new to society, while also allowing (and thus stimulating) others to build upon, add to, and develop those creations." *Meshwerks, Inc.*, 528 F.3d at 1262.  Originality requires that the work is "independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publications, Inc.*, 499 U.S. at 345.

Copyrights may protect photographs, but "only to the extent of their *original* depiction of the subject." *Meshwerks, Inc.*, 528 F.3d at 1264.  If a photograph lacks "decisions regarding lighting, shading, angle, background, and so forth," it is not copyrightable. *Id.* at 1265 (internal quotations omitted).  To determine whether a photograph can be protected by a copyright, the courts "filter out" objects not subject to a copyright and determine whether any "copyrightable expression remain[s]." *Id.* at 1266.

Harvard asserts that the "angle and depth of field" in a photograph are protected by copyright and cites *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444 (S.D. N.Y. 2005) to support this assertion.  Yet in *Mannion*, the court emphasized the "unusual angle and distinctive lighting" in that specific photograph to support the court's determination that the photograph was original. *Id.* at 455.  In *Mannion*, the district court considered a photograph of basketball star Kevin Garnett, where the photographer captured a "three-quarter-length portrait of Garnett

against a backdrop of clouds with some blue sky shining through." *Id.* at 447.  The photograph depicts Garnett's "heavily veined hands" hooked on the waistband of his pants. *Id.*  The view of the photograph is from the bottom left of Garnett, "so that he appears to be towering above earth." *Id.*  Garnett wears plain, white clothes offset by a large amount of jewelry. *Id.*  Garnett's head is cocked and his eyes are closed. *Id.*  The court contrasted this with a previous case involving photographs where the photographer "sought to reproduce precisely paintings in the public domain." *Id.* at 451.  The court acknowledged that the photographer may have applied "a great deal of effort and expertise . . . including decisions about camera, lens, and film," but emphasized that "sweat of brow is not the touchstone of copyright." *Id.*  Consequently, those "slavish copies," unlike the distinctive depiction of Garrett, were not original and therefore not copyrightable. *Id.*  The court further concluded that in rare cases where "a photograph replicates another work with total or near-total fidelity," it lacks originality. *Id.* at 452.

Both *Mannion*  and *Meshwerks, Inc.*, reference another analogous case to the one at bar. *See Mannion*, 377 F. Supp. 2d at 452; *Meshwerks, Inc.*, 528 F.3d at 1265 (referencing *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301 (S.D.N.Y. 2000)).  In *SHL Imaging, Inc.*, the court discussed photographs of picture and mirror frames, taken for a merchant who designed, manufactured, and sold picture and mirror frames, to be used in a catalogue to sell the products. *Id.* at 303.  The court noted the decisions the photographer made regarding the camera, lens and film, as well as the careful use of light " 'to fill out the shadows (but not eliminate them) to give a chiaroscuro effect that would wrap around the [frame] and give it depth.' " *Id.* at 304, 311 (quoting the photographer's affidavit).  The photographer carefully manipulated the "lighting design [to] enhance[ ] the luster of each frame's gilt." *Id.* at 304.  The court contrasted these photographs with others of the same frames, where "[t]he gilded frames are dull and the

details are obscured by shadows or overexposed." *Id.* at 311.  Although the court found that the photographer's decisions and resulting impact on the photographs were sufficient to extend copyright protection, the photographs were "not entitled to broad copyright protection." *Id.* Indeed, the court determined that "Practically, the [photographer's] works are only protected from verbatim copying." *Id.*

Although Harvard's *Historic Hopi Ceramics* has a registered copyright (Ex. 8), the copyright likely does not protect the book's photographs of pottery in the Keam collection and certainly does not protect it from the colored line art copies used in Mr. Elmore's book.  Harvard admits that it cannot claim copyright protection for the imagery on the pottery itself.  (Doc. 5 at 23).  Other than this imagery, the pictures depict no originality.  The pictures in *Historic Hopi Ceramics* depict only the pots and include no background.  (*See* Supp. Ex. 2.)  Unlike Harvard's photography standards today (*see* Schneiderman Test. in Dec. 7, 2015 Hr'g), Harvard has not described any such intentional decisions to best portray its artifacts.  Moreover, the illustrations in Mr. Elmore's book necessarily lack the lighting from the images because Mr. Diedrickson removed the gray scale and filled each line with one of three chosen colors.  (Diederichsen Test. in Dec. 7, 2015 Hr'g.)  Although the process was not significant, it certainly was more than "verbatim copying."

The issue is far less clear for the copied photograph from the Harvard website.  The image certainly appears to have been copied directly from the image online.  (*Compare* Ex. 5 *with* Supp. Ex. 1 at 182.)  Thus, even the most minimal originality in the photograph would protect against such infringement.  *See SHL Imaging, Inc.*, 117 F. Supp. 2d at 311.  Even so, the Court has no evidence, such as an affidavit from the artist or examples of images depicting the same subject that lack the same intentionality, like the evidence in *SHL* to demonstrate even the

smallest, "incremental contribution" of originality.  *Id.*  As such, and given the high burden for disfavored preliminary injunctions, Harvard cannot meet its burden of proof on the copyright claim for the photograph either.

      *iii.*     *False Designation of Origin*

False designation of origin, pursuant to 15 U.S.C. § 1125(a), occurs where (1) the plaintiff has a protectable interest in a trademark; (2) the defendant "used an identical or similar trademark in commerce"; and (3) the defendant "likely confused customers by using a similar trademark."  *1–800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). Specifically, § 1125(a) prohibits a person from using "in commerce any word . . . or any false designation of origin . . . [which] is likely to cause confusion . . . as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities."  15 U.S.C. § 1125(a).  Use of a protected trademark causes confusion when it misleads the customer as to the source of a product.  *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32 (2003) (offering, for example, if Coca–Cola were to attempt to sell its product disguised as a Pepsi–Cola product).  Trademark protection applies both to misidentified physical property as well as misidentified intellectual property.  *Id.* at 36 (noting potential liability for crediting the creator of intellectual property where the credit could "be regarded as implying the creator's sponsorship or approval").

Harvard owns registered and unregistered trademark rights in "Peabody Museum of Archaeology and Ethnology," and "Harvard University."  (Doc. 17 ¶ 61.)  The addendum to Mr. Elmore's book explicitly states that "all . . . photographs and illustrations [are] courtesy of the Peabody Museum of Archaeology and Ethnology, Harvard University."  (Ex. 4.)  The trademarks are not only similar, but identical.  The book is in commerce (Doc. 13-1 ¶ 20), and

Mr. Elmore's assertion that the photographs and illustrations are "courtesy" of Harvard is clearly misleading. Even without the addendum, each photograph caption references "Keam collection" or "Peabody." Since the Museum controls the access to its objects, a purchaser of the book could easily assume that the Museum allowed and approved use of the photographs. Consequently, Harvard is likely to prevail on this claim.

### D. Irreparable Injury

To satisfy the irreparable harm requirement, the movant must show "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling*, 552 F.3d at 1210 (quoting *Greater Yellowstone Coal*, 321 F.3d at 1258). The standard requires that the injury be "both certain and great" not "merely serious or substantial." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008). "Speculative harm does not amount to irreparable injury." *Schrier*, 427 F.3d at 1267 (internal citations omitted). However, trademark "infringement alone can constitute irreparable injury" and a movant need not show lost sales or other specific incurred damages. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

Delay in seeking relief can undercut this "presumption that infringement alone has caused irreparable harm." *Id.* In *GTE Corp.*, the court determined that the delay was too long where the infringement was ongoing for eight years and the movant had known about infringement for three years. *Id.* In *Packerware Corp. v. Corning Consumer Products Co.*, 895 F. Supp. 1438, 1452 (D. Kan. 1995), the court determined that a three month delay was sufficient in light of the defendant's "intensive product launch" of the infringing material. Even if a movant does not delay in requesting a preliminary injunction, evidence that circumstances have not changed while the court considers the motion can counter-balance the presumption that the trademark infringement caused irreparable harm. *See Amoco Oil Co.*, 809 F.2d at 664. Even though the

movant did not delay seeking relief in *Amoco Oil Co.*, the court denied the preliminary injunction in part because the movant failed to provide any new evidence of injury during the two years between the district court's denial of injunctive relief and consideration upon remand. *Id.*

Here, Harvard has shown that Mr. Elmore has likely infringed on Harvard's protected trademarks.   This case contains some similarities to *Packerware Corp.*, but meaningful differences exist.  Although Harvard delayed for six months before initiating suit (*compare* Ex. 17 with Doc. 1), Harvard did not delay in contacting Mr. Elmore to attempt to resolve their concerns (*see* Ex. 17 (responding to Mr. Elmore's pre-order email in less than a week).  It is true that Harvard was aware of Mr. Elmore's product launch (*id.*), but the product launch could not have been as "intensive" as a launch from a major retailer such as Corning Consumer Products. Moreover, Harvard did not simply move for a preliminary injunction and wait; it also independently contacted Amazon to cease sales.  (Doc. 46-2.)  Lastly, Harvard spent the six months "attempt[ing] to open a dialogue with Mr. Elmore and find a mutually agreeable resolution."  (Doc. 24 at 4; *see* Doc. 6 ¶ 23.)   Consequently, even if the delayed time decreases the presumption that the trademark infringement constitutes irreparable injury, the infringement still weighs strongly in Harvard's favor.

Moreover, circumstances since the initiation of the suit also support Harvard's claim of irreparable damage.  Mr. Elmore has sold eight hundred copies of his book.  (*see* Closing Arg. in Dec. 7, 2015 Hr'g).  In every book, over one hundred images include the caption "Keam Collection" or "Peabody."  (*See* Supp. Ex. 1.)  In many of the books, an unbound, paper sheet calls further attention to the photographs and states that they are "courtesy of" Harvard.  (Ex. 4.) The Court need not find that the images are "low-quality" (Doc. 5) to determine that the

backdrops in many of the pictures and restoration quality of many of the artifacts do not adhere to Harvard's standards for publishable photographs.  (*See, e.g.* Ex. 3; Supp. Ex. 1 at 83.) Harvard's extensive policies for controlling pictures, both taken by researchers at the Museum (*see* Exs. 2; 18) and for use of photographs on its websites (Ex. 18) demonstrate Harvard's careful attention to published works that display artifacts in its collection.  Lack of adherence to these policies harms Harvard's reputation.  (Schneiderman Test. in Dec. 7, 2015 Hr'g.)  In six months, a researcher has already visited the Museum and challenged the Photography Agreement based on Mr. Elmore's book.  (*Id.*)  Harvard has already suffered irreparable harm and further sale of the book will exacerbate this harm.

### E.  Weight of Movant's Injury Compared to Nonmovant's Injury

"When the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement."  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1229 (10th Cir. 2007) (discussing infringement pursuant to 15 U.S.C. § 1125(a)).

Here, Harvard's case for trade infringement, pursuant to 15 U.S.C. § 1125(a) is clear. Although Mr. Elmore asserts he would suffer injury because he will be unable to sell his book and Mr. Elmore has already invested effort to advertise his book (*see* Doc. 7 Ex. D), these harms do not weigh heavily in Mr. Elmore's favor because the book infringes on Harvard's trademarks. *See Gen. Motors Corp.*, 500 F.3d at 1228.  Harvard's irreparable injury to its reputation as a result of trademark infringement and contract violation weighs heavily against Mr. Elmore's interest in continuing to sell the book that perpetuates these injuries.

### F.  Public Interest

In copyright cases, the public interest factor "normally weighs in favor of the issuance of an injunction because the public interest is the interest in upholding copyright protections."

*Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1499 (10th Cir. 1993) *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011).  Similarly, the Third Circuit and district courts in this Circuit have concluded that "in a trademark case, [public interest] is most often a synonym for the right of the public not to be deceived or confused."  *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (citations omitted); *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1228 (D. Colo. 2001); *see also* 2 McCarthy, § 30:21.  Indeed, trademark protection "benefits the consumer by preventing confusion about the source of products, and by instilling in consumers the confidence that inferior goods are not being passed off by use of a familiar trademark."  *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 651 (10th Cir. 1996) (internal quotations omitted).

Several public interests weigh in favor of a preliminary injunction.  Whereas Harvard is unlikely to prevail on its copyright claim, Mr. Elmore likely infringes on Harvard's trademarks. Moreover, even though the public may have an interest in viewing Mr. Elmore's book and benefitting from his research, that interest is decreased because the inadequate captions inhibit future researchers from further studying the artifacts pictured.  (Schneiderman Test. in Dec. 7, 2015 Hr'g.)  Additional damage exists here due to Harvard's role in supporting independent research.  If Mr. Elmore's book continues to mislead other researchers into believing they too can use their research photographs in published works, Harvard may decide to limit access to its collections.  (*See* Schneiderman Test. in Dec. 7, 2015 Hr'g.)  Such a decision would not only impact the ninety-five percent of researchers who visit the collections and wish to take photographs, but also the public who benefit from that research.

A preliminary injunction is warranted to avoid confusion regarding the source of the pictures included throughout Mr. Elmore's book and to maintain reasonable access for future research.

## III.   CONCLUSION

Harvard satisfies its heavy burden for a preliminary injunction.  Although the injunction is a disfavored mandatory injunction, the "traditional four factors weigh heavily and compellingly in [Harvard's] favor."  *Dominion Video Satellite, Inc.*, 269 F.3d at 1154.  Harvard is likely to succeed on the merits of the contract and trademark infringement claims.  Harvard has established irreparable injury based on the trademark infringement and ongoing damage to its reputation.  Although Mr. Elmore will suffer harm from the preliminary injunction, that harm is a result of his decision to publish a book that likely infringes on Harvard's trademarks.  Finally, the public interest is served by avoiding confusion regarding the source of the photographs and retaining access for future research.  Since Harvard is only likely to prevail on its contract and trademark infringement claims, the preliminary injunction will only enjoin Mr. Elmore from further advertising, selling, offering for sale, distribution, or other exploitation of his book, *In Search of Nampeyo: The Early Years, 1875–1892*, and from any publication, reproduction, or exhibition of his photographs taken in the Peabody Museum of Archaeology and Ethnology.

**THEREFORE**,

**IT IS ORDERED** that Harvard's Motion for Preliminary Injunction (Doc. 5) is **GRANTED** in part and **DENIED** in part.

**ROBERT C BRACK**
**UNITED STATES DISTRICT JUDGE**