## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,

      Plaintiff,

v.                                                          No. CIV 15-00472-RB/KK

STEVE ELMORE, STEVE ELMORE
PHOTOGRAPHY, INC., d/b/a STEVE ELMORE
INDIAN ART, and d/b/a SPIRIT BIRD PRESS,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's Motion to Dismiss Defendant Steve Elmore's Counterclaims (Doc. 37).   Plaintiff President and Fellows of Harvard College (Harvard) and Steve Elmore contracted to produce and publish a book, but Harvard declined Mr. Elmore's manuscript.   (Docs. 22-1; 22-2.)   After Mr. Elmore published the book on his own, Harvard sued, alleging copyright infringement, breach of contract, and false designation of origin.   (Doc. 1; *see also* Doc. 17 (amending the complaint).)   Mr. Elmore filed a counterclaim, requesting declaratory judgment and alleging breach of contract, breach of covenant of good faith and fair dealing, tortious interference with contractual relations, tortious interference with prospective contractual relations, conversion, misappropriation of intellectual property, prima facie tort, unjust enrichment, and punitive damages.   (Doc. 22 at 11–26 (Countercl.).)   Harvard moved to dismiss all claims save the request for declaratory judgment.   (Doc 37.)   Having

reviewed the parties' submissions and arguments, the Court **GRANTS** Plaintiff's Motion to Dismiss Defendant Steve Elmore's Counterclaims in part and **DISMISSES** with prejudice Mr. Elmore's claims for tortious interference with prospective contractual relations, misappropriation of intellectual property, prima facie tort, unjust enrichment, and punitive damages relating to these claims.  The Court **DENIES** Harvard's motion to dismiss as to Mr. Elmore's claims for breach of contract regarding reimbursement of travel expenses, breach of covenant of good faith regarding the contract with another author, tortious interference with existing contractual relations, conversion regarding Harvard's actions with Amazon.com, Inc. (Amazon), and punitive damages relating to these claims.

I.      **BACKGROUND**

This case began with an invitation and a proposal.  In 2009, the curator of collections at the Peabody Museum of Archaeology and Ethnology (the Museum) invited Mr. Elmore to submit a book proposal to Peabody Museum Press (the Press).  (Countercl. ¶ 8.)  Mr. Elmore submitted his proposal to the Press editor, and it was "unanimously accepted by the board with enthusiasm."  (*Id.*)  Mr. Elmore and Harvard contracted to publish the book, provisionally titled *In Search of Nampeyo: the Apprenticeship of a Great Hopi Artist*.  (Doc. 22-1 at 1.)  The book would discuss "selected pieces of pottery" in Harvard's Keam collection, held by the Museum. (*Id.*)

In the contract, attached to Mr. Elmore's counterclaim, the parties agreed the manuscript would be a "Work Made for Hire."  (Doc. 22-1 at 2.)  Mr. Elmore agreed to "write and deliver to [the Press] . . . a complete manuscript ( . . . including front matter, text, bibliographic references, copies of illustrations, and figure captions)" by March 31, 2012.  (*Id.* at 1.)  Mr. Elmore was to "work in consultation with the Museum and the Press to select objects from the collection for

2

illustration in the volume." (*Id.*)  The Museum was to "handle all photography and produce any other needed artwork for the volume" and to "manage editorial, design, and production work for the volume . . . ." (*Id.*)  "If Mr. Elmore fail[ed] to submit the manuscript by [March 31, 2012], the Museum ha[d] the right to refuse publication of the work[,]" but, the contract could also "be extended by mutual written agreement of the two parties." (*Id.* at 2.)  The Museum agreed "to provide Mr. Elmore with up to $1,500.00 in expense reimbursement for a research visit to the Museum" and agreed to pay Mr. Elmore "$1,000.00 upon completion and acceptance of the manuscript following peer review." (*Id.*)

Mr. Elmore submitted his first version of the manuscript to Harvard on May 10, 2012. (Countercl. ¶10.)  In the manuscript, Mr. Elmore concluded that "many" of the artifacts in the Keam collection were created by the Hopi artist Nampeyo. (*Id.*)  The Press editor and three anonymous academic readers reviewed the manuscript. (*Id.* at ¶ 12.)  Although one recommended accepting it without revision, the second reviewer recommended accepting it with revisions, and the third reviewer recommended rejecting it. (*Id.*)  The Press editor instructed Mr. Elmore to "write lengthy responses to the questions and criticisms of the three anonymous reviewers." (*Id.* at ¶ 13.)  After the Press editor reviewed Mr. Elmore's responses to the reviewers, she and the Press Editorial Advisory Board recommended that Mr. Elmore rewrite the manuscript as a full academic paper for Harvard, and "Harvard promised a second contract, which was never provided to Mr. Elmore." (*Id.*)  According to the counterclaim, someone from Harvard and "the Peabody" told Mr. Elmore that the manuscript was "excellent academically, but too detailed for the regular Peabody Museum series . . . ." (*Id.* at ¶ 11.)

Absent the promised contract, Mr. Elmore submitted a second version of the manuscript in November 2013. (Countercl. ¶ 14.)  This version "contained over 80 additional pages

explaining more of Mr. Elmore's methodology and linking his original research to earlier works of art history." (*Id.* at ¶ 25.)  Mr. Elmore alleges that "[o]ver a period of several months, [the Press editor] continually represented to Mr. Elmore that she fully expected Mr. Elmore's manuscript to be published." (*Id.* at ¶ 15.)

In January 2014, however, Harvard declined to publish the manuscript. (Doc. 22-2.)  In a letter to Mr. Elmore, the Press editor informed Mr. Elmore that The Press Editorial Advisory Board reviewed the revised manuscript and "concluded that the project is not a fit with [their] editorial and publishing priorities and standards." (*Id.*)  It further quoted a board member who stated, "We are an academic press, and this is not an academic book." (*Id.*)  In the letter, Harvard "return[ed] . . . all rights in the manuscript . . . , including all versions of the manuscript submitted to the Peabody Museum Press" and "recommend[ed] that [Mr. Elmore] find a magazine or trade publisher" to publish the manuscript. (*Id.*)  The Press editor noted she "would support publication" with the American Indian Art Magazine. (*Id.*)  Mr. Elmore later published his manuscript, now entitled *In Search of Nampeyo: The Early Years, 1875–1892*, through an independent publisher. (Countercl. ¶ 20.)  According to Mr. Elmore, Harvard "benefitted from the praise the book has received[,]" especially since Mr. Elmore thanked Harvard for maintaining the collection of artifacts and assisting with Mr. Elmore's research. (*Id.*)

In December 2014, an author approached Mr. Elmore, claiming she had "secur[ed] writing projects with Harvard and the Peabody on Nampeyo's ceramics in the Keam collection" and interrogated Mr. Elmore "specifically about the information in his manuscript . . . ." (Countercl. ¶ 22.)  Based on this information, Mr. Elmore alleges that "Harvard has contracted with [another author] . . . for the publication of another book about Nampeyo and the Keam Collection, which relies on the original research conducted by Mr. Elmore, including but not

limited to the results drawn therefrom, and attribute it as their own." (*Id.* at ¶ 24.) Specifically, Mr. Elmore alleges that Harvard "failed to advise Mr. Elmore it had no intention of publishing his work" in order to extract additional information on his methodology and subsequently contract with the other author to "misappropriate Mr. Elmore's work . . . ." (*Id.* at ¶¶ 25–26.)

Mr. Elmore further alleges that Harvard claims "ownership of the contents of the manuscript based on its interpretation of the original contract and the letter returning rights to Mr. Elmore. (Countercl. ¶¶ 27, 80.) Specifically, Harvard claimed Mr. Elmore's Book "as their own" and caused Amazon to remove it from their website, even though Mr. Elmore had a contract with Amazon for sale and distribution of his book. (*Id.* at ¶¶ 32, 47.) Due to Harvard's claims, Mr. Elmore was also "forced" to delay a contract with a public relations firm, which would have included the release of a media kit on the book to 600 media outlets. (*Id.* at ¶ 32.)

In June 2015, Harvard sued Mr. Elmore, alleging copyright infringement, breach of contract, and false designation of origin (Doc. 1.) Mr. Elmore filed a counterclaim, alleging breach of contract, breach of covenant of good faith and fair dealing, tortious interference with contractual relations, tortious interference with prospective contractual relations, conversion, misappropriation of intellectual property, prima facie tort, unjust enrichment, declaratory judgment, and punitive damages. (Countercl.)

Mr. Elmore's claims for Count I, breach of contract, Count II, good faith and fair dealing, Count III, tortious interference with existing contractual relations, and Count V, conversion, all survive Harvard's motion to dismiss. Conversely, the Court dismisses Count IV, tortious interference of prospective contractual relations, Count VI, misappropriation of intellectual property, Count VII, prima facie tort, and Count VIII, unjust enrichment. The Court also

dismisses Count X to the extent that it alleges entitlement to punitive damages associated with Courts IV, VI, VII, and VIII.

## II.  LEGAL STANDARD

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The factual allegations, accepted as true, must "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

A plaintiff must "'nudge [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190, 1192 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 570). Claims fail to cross that line "if they are so general that they encompass a wide swath of conduct, much of it innocent . . . ." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. As long as sufficient factual matter exists to sustain a claim, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Even so, counsel may not overcome pleading deficiencies with arguments that extend beyond the allegations contained in the complaint. *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 550 (10th Cir. 1997).

6

"Generally, the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Limited exceptions apply, however, for "(1) documents that the complaint incorporates by reference; (2) 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity'; and (3) 'matters of which a court may take judicial notice . . . .'" *Id.* (internal citations omitted) (citing and quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 941 (10th Cir. 2002)). If the court considers any other evidence, the court must first convert the motion to dismiss to a motion for summary judgment and give proper notice to the parties." *Gee*, 627 F.3d at 1186.

## III.   CONTRACT CLAIM

Contracts require "an offer, an acceptance, consideration, and mutual assent." *DeArmond v. Halliburton Energy Servs., Inc.*, 81 P.3d 573, 577 (N.M. Ct. App. 2003). If parties disagree on a term in a contract, New Mexico courts authorize "extrinsic evidence concerning the circumstances surrounding the execution of the agreement to determine if contract terms are in fact ambiguous." *Strata Prod. Co. v. Mercury Expl. Co.*, 916 P.2d 822, 830 (N.M. 1996.) To survive a motion to dismiss for failure to state a claim, a claim for breach of contract must "identify a contractual promise that was breached" and the defendant's action "that constituted a breach." *Willis v. Dep't Stores Nat. Bank*, 613 F. App'x 755, 757 (10th Cir. 2015).

Here, Mr. Elmore alleges Harvard "had a contractual obligation . . . to work with Mr. Elmore towards the development and publication" of the book and Harvard breached that promise "by failing to assist in the development of the manuscript, by arbitrarily terminating the

[a]greement[,] . . . and by failing to pay the amounts" promised by the contract.[1]  (Countercl. ¶¶ 34–35.)  The contract attached to Mr. Elmore's complaint, however, contains no obligation "to work with Mr. Elmore towards development" of the manuscript.  (*See* Doc. 22-1.)  Instead, it requires Mr. Elmore to write and deliver the manuscript.  (*Id.* at 1.)  The contract contemplates some "consultation with the Museum and Press[,]" but only for selecting objects for illustration.  (*Id.*)  Mr. Elmore makes no assertion that the failure to assist with illustrations caused the dissolution of the agreement.  The contract also requires the Press to "manage editorial . . . work for the volume[,]" but Mr. Elmore alleges no extrinsic evidence to show that the parties intended a broader meaning for "editorial . . . work" or consultation on illustrations.  (*Id.*)  Without any such evidence, Mr. Elmore's allegation that Harvard failed to "assist in development" encompasses a much broader range of conduct than failure to conduct mere editorial work and consult on illustrations.  *See Robbins*, 519 F.3d at 1247.  Thus Mr. Elmore fails to state a plausible claim for breaching the contract for failing to "assist in development" of the book.

For the remaining breach of contract claims, the contract provides two contingencies.  First, Harvard could refuse to publish the manuscript if Mr. Elmore failed to submit the manuscript by March 31, 2012.  (Doc. 22-1 at 2.)  Second, Harvard would only pay Mr. Elmore the $1,000.00 honorarium "upon completion and acceptance of the manuscript following peer review."  (*Id.*)  Mr. Elmore acknowledges he failed to meet the first deadline and his manuscript was never accepted for peer review.  (Countercl. ¶¶ 10, 12.)  Thus, Mr. Elmore fails to state facts to plausibly allege that Harvard breached the contract by terminating it and failing to pay the

---

[1] Mr. Elmore also claims that although the parties never agreed to extend their agreement in writing, "Harvard promised a second contract."  (Countercl. ¶ 13.)  In his reply, Mr. Elmore argues that the second contract was a unilateral contract, which he accepted upon performance.  This claim, however, was not alleged in the complaint and thus cannot stand.  *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 550 (10th Cir. 1997).

honorarium.   Harvard's reimbursement of expenses to visit the museum, however, are not contingent on publication.   To the extent that the contract claim involves Harvard's reimbursement of $1,500 for expenses to visit the museum, the claim survives.

## IV.    GOOD FAITH AND FAIR DEALING

"The implied covenant of good faith and fair dealing protects the reasonable expectations of the parties to a contract arising from its terms." *Sanders v. FedEx Ground Package Sys., Inc.*, 188 P.3d 1200, 1202 (N.M. 2008).   This implied covenant seeks to "mak[e] effective the agreement's promises." *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 925 (N.M. Ct. App. 2003).   To show a breach of this covenant in New Mexico, the plaintiff must show "bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." *Sanders*, 188 P.3d at 1203 (quoting *Cont'l Potash, Inc. v. Freeport–McMoran, Inc.*, 858 P.2d 66, 82 (N.M. 1993)).   In other words, a party breaches the covenant by "seek[ing] to prevent the contract's performance or . . . withhold[ing] its benefits from the other party." *Azar*, 68 P.3d at 925.   "Importantly, the implied covenant of good faith and fair dealing cannot be used to overcome or negate an express term contained within a contract." *Sanders*, 188 P.3d at 1203.

Mr. Elmore claims Harvard breached its covenant of good faith and fair dealing by failing to work towards the development and publication of the manuscript, terminating the agreement, representing to Mr. Elmore that all rights in the manuscript were returned to him and then claiming superior rights to the manuscript, claiming rights to Mr. Elmore's photographs included in the manuscript, and contracting with another author to misappropriate Mr. Elmore's intellectual property.   (Countercl. ¶ 42.)

Mr. Elmore's claims that Harvard failed to work on and publish the manuscript and then terminated the agreement fail because, as discussed previously, the contract expressly outlined the parties' responsibilities. *See supra* Section III.   These claims "negate . . . express term[s] in

the contract" and thus cannot show bad faith.  *Sanders*, 188 P.3d at 1203.  Mr. Elmore's second set of claims, that Harvard asserted its own rights to the manuscript and photographs, fail because these actions neither prevented the original contract's performance nor withheld benefits of the contract from Mr. Elmore.  *See Azar*, 68 P.3d at 925.  The parties agreed the manuscript would be a Work Made for Hire (Doc. 22-1 at 2), and thus Harvard "own[ed] all of the rights comprised in the copyright."  17 U.S.C. § 201(b).  The contract does not require Harvard to return the rights if the manuscript was not approved for publication.  (*See* Doc. 22-1.) Consequently, Harvard's alleged failure to honor its subsequent decision to return rights to Mr. Elmore never denied Mr. Elmore of his "reasonable expectations arising from the contract." *Sanders*, 188 P.3d at 1203.

Lastly, Mr. Elmore asserts that Harvard "misappropriate[ed] Mr. Elmore's research" by contracting with another author to publish a manuscript using Mr. Elmore's research and "claim it as their own."  (Countercl. ¶ 42.)  Mr. Elmore alleges he added 80 pages to explain his methodology and expand his research after Harvard recommended he rewrite the manuscript as a full academic paper and promised another contract.  (*Id.* at ¶¶ 11, 14, 25.)  The original contract contemplates that written agreements may extend the contract in certain circumstances.  (Doc. 22-1 at 2.)  Mr. Elmore's assertion that Harvard encouraged him to further explain his methodology and research with the intent to deny Mr. Elmore the benefit of publication and the intent to use Mr. Elmore's research in another manuscript provides sufficient specificity to nudge his claim into the realm of plausibility.  *See Khalik*, 671 F.3d at 1190; *Twombly*, 550 U.S. at 556. Thus, to the extent that Mr. Elmore's claim for breach of good faith and fair dealing applies to these alleged facts, this claim survives Harvard's motion to dismiss.

## V.     TORTIOUS INTERFERANCE WITH AMAZON.COM, INC.

There are two types of claims for tortious interference: interference with existing contracts and interference with prospective contacts.  *See Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003).  For existing contracts, "a plaintiff must establish that the defendant, without justification or privilege to do so, induce[d] a third person not to perform a contract with another." *LensCrafters, Inc. v. Kehoe*, 282 P.3d 758, 767 (N.M. 2012) (quoting *Deflon v. Sawyers*, 137 P.3d 577, 583 (N.M. 2006)).  The elements of the claim require that:

> (1) the defendant had knowledge of the contract, (2) the plaintiff was unable to fulfill the contract's obligations, (3) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract, (4) the plaintiff suffered damages resulting from the breach, and (5) the defendant induced the breach without justification or privilege to do so.

*Id.* at 767.

Privilege and justification address situations where a defendant has proper motives and uses proper means to interfere with the contract.  *See Fikes*, 81 P.3d at 552 (discussing privilege as "[a] motive to protect one's own interest"); *see also In re Borges*, 485 B.R. 743, 783 (Bankr. D.N.M. 2012), *aff'd*, 510 B.R. 306 (B.A.P. 10th Cir. 2014) ("The 'without justification or privilege' element can be met by demonstrating that the defendant's actions were done through improper means or with an improper motive.").  Privilege arises from an act, taken in good faith, to protect a defendant's legal interest.  *Fikes*, 81 P.3d at 552.  For most existing contracts, unlike prospective contracts and at will contracts, a plaintiff need not show that the sole motive was improper, but rather only that "the party's primary motivation for the interference" was improper.  *Id.*; *Kelly v. St. Vincent Hosp.*, 692 P.2d 1350, 1356 (N.M. Ct. App. 1984).  "If it was primarily improper, then the person has no privilege.  If it was primarily proper, then liability should not attach."  *Fikes*, 81 P.3d at 552–53.

11

Here, Mr. Elmore claims tortious interference with contractual relations because Harvard "caused [Amazon] not to perform the contract it has with Mr. Elmore for the sale and distribution" of Mr. Elmore's book. (Countercl. ¶ 47.) Mr. Elmore asserts that Harvard acted through "improper means and/or improper motives" and "induced the breach without justification or privilege." (*Id.* at ¶ 49.) Mr. Elmore's assertion that Harvard sought to contract with another author to use Mr. Elmore's research and attribute it as its own (*see id.* at ¶ 24) supports a plausible claim that Harvard acted with an improper motive.

Harvard responds that its actions were justified because it notified Amazon pursuant to the Digital Millennium Copyright Act (DCMA). (Doc. 37 at 8.) *See Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1006 (9th Cir. 2004) (deciding on summary judgment that the defendant's "compliance with the notice and takedown procedures detailed in the DMCA met Hawaii's standards for justification). In fact, Mr. Elmore acknowledges that Harvard "claimed ownership of the contents of the manuscript under the interpretation of the" original contract and letter returning rights to the manuscript. (Countercl. ¶ 80.) Mr. Elmore, however, dismisses Harvard's argument as an affirmative defense, arguing it is inappropriate for a 12(b)(6) motion.

New Mexico law does not clearly state whether justification and privilege are elements the plaintiff must claim or affirmative defenses. *See M & M Rental Tools, Inc. v. Milchem, Inc.*, 612 P.2d 241, 247 (N.M. Ct. App. 1980) (explaining the divergent views and determining that "plaintiff has the burden of proving the interference was improper"); *Ettenson v. Burke*, 17 P.3d 440, 446 (N.M. Ct. App. 2001) (relying on dicta in *M & M Rental Tools, Inc.*, 612 P.2d at 247 to hold that the defendant bears the burden to show improper motive in cases of economic competition). A defendant may raise an affirmative defense on a Rule 12(b)(6) motion only "[i]f

the defense appears plainly on the face of the complaint itself . . . ."  *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965) (determining error to dismiss for res judicata).

Although not settled, New Mexico law regarding privilege and justification as affirmative defenses is not dispositive here.  Harvard may have been justified in acting pursuant to the DCMA, *see Rossi*, 391 F.3d at 1006, or privileged for acting in good faith to protect a legal interest, *see Fikes*, 81 P.3d at 552.  Mr. Elmore need not disprove that.  Instead, he need only assert facts to allow the Court to make a reasonable inference that even if Harvard acted to protect a legal interest, its primary motive was improper.  *See Fikes*, 81 P.3d at 552–53.  Mr. Elmore asserts that Harvard sought to use Mr. Elmore's research and attribute it to another author (*see* Countercl. ¶ 24), which supports a plausible claim that Harvard acted primarily with an improper motive.  Thus, this claim survives Harvard's motion to dismiss.

## VI.   TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTS

"American courts are not as willing to protect interests in prospective contractual relations as they are to protect interests in existing contracts."  *Anderson v. Dairyland Ins. Co.*, 637 P.2d 837, 840 (N.M. 1981) (quoting J. Henderson & R. Pearson, The Torts Process 1166 (2d ed. 1981)).  A defendant tortiously interferes with prospective contractual relations if the defendant "intentionally and improperly interferes with another's prospective contractual relation . . . to the other for the pecuniary harm resulting from loss of the benefits of the relation . . . ."  Interference may consist of "(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation."  *M & M Rental Tools, Inc.*, 612 P.2d at 245.  No matter how interference occurs, a plaintiff must show that the defendant acted either with an improper motive *solely* to harm the plaintiff or an improper means to interfere with the contractual relations.  *Id.* at 246.

13

Mr. Elmore claims he would have entered into other contracts if Harvard had not labeled his work "unacademic" or not academic.  (Countercl. ¶ 21.)  Most of Mr. Elmore's assertions for this claim are merely conclusory.  (*See id.* at ¶¶ 54, 56 ("Harvard has intentionally and inmproperly interfered with these prospective contractual relations").)  In fact, Mr. Elmore's counterclaim includes only three facts to support the claim.  First, "Harvard . . . openly criticized and ridiculed Mr. Elmore's work as unacademic and not to the standards of Harvard and the [Press]."  (*Id.* at ¶ 28.)  Second, in its letter returning rights to Mr. Elmore, a board member justified the decision, saying, "We are an academic press, and this is not an academic book."  (Doc. 22-2.)  Third, Mr. Elmore asserts he was "forced" to cancel a contract with a public relations firm.  (Countercl. ¶ 32.)

These facts are insufficient to support a plausible claim that Harvard tortiously interfered with Mr. Elmore's prospective contractual relations.  Mr. Elmore asserts no facts to indicate that Harvard knew about the public relations contract or knew that its comments would impact the contract.  *See M & M Rental Tools, Inc.*, 612 P.2d at 245 (requiring that the defendant intentionally interfere).  Second, Mr. Elmore asserts no improper means for interfering with the prospective contract and the facts do not allow the Court to reasonably infer that Harvard's sole motive was improper.  Harvard just as likely made the statements to explain its rationale for rejecting the manuscript.  Consequently, the facts are insufficient to support a claim for tortious interference with a prospective contract.

## VII.   CONVERSION

"Conversion is 'the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an

unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Muncey v. Eyeglass World, LLC*, 289 P.3d 1255, 1262 (N.M. 2012).[2]

Mr. Elmore claims that Harvard returned all rights in the manuscript to him in its letter denying publication (Doc. 22-2), but later "openly disregarded and openly claimed a right superior to Mr. Elmore's" rights to the manuscript.  (Countercl. ¶¶ 60–61.)  Beyond these conclusory remarks, Mr. Elmore alleges that Harvard contracted with another author to publish a book that relies on Mr. Elmore's research and "attribute that research as their own." (*Id.* at ¶ 24.) These facts fail to support conversion because Mr. Elmore alleges only a contract, not any actual "exercise [of] dominion and control" over Mr. Elmore's property rights.  As such, the claim relating to these facts is premature and is dismissed without prejudice.

Next, Mr. Elmore asserts that Harvard claimed Mr. Elmore's book "as [its] own" when Harvard caused Amazon to remove the book from its website.  (Countercl. ¶ 32.)  Based on Mr. Elmore's alleged facts, Harvard defied Mr. Elmore's rights to his manuscript by claiming its own rights to the book and causing Amazon.com to remove the book from the website.  Harvard requests that the Court consider a photography agreement, which Mr. Elmore signed and Harvard claims restricts Mr. Elmore's use of the photographs included in his book.  (Docs. 37 at 12; 50 at 10.)  However, Mr. Elmore did not incorporate this agreement into his counterclaim; in fact, he never even refers to it.  Consequently, the Court cannot consider it in a 12(b)(6) motion to dismiss.  *See Gee*, 627 F.3d at 1186.  Thus, this claim survives the 12(b)(6) motion to dismiss.

---

[2] Some states may include intangible intellectual property as personal property, *see Paradigm All., Inc. v. Celeritas Techs., LLC*, 659 F. Supp. 2d 1167, 1189 (D. Kan. 2009),  while others may not, *see Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284, 1287 (D. Utah 2009). New Mexico conversion law is unresolved on the matter.  *See Muncey*, 289 P.3d at 1260 (N.M. 2012) (considering a conversion claim only after determining that the property was not protected by copyright and clarifying that the conversion claim involved only the tangible item).  The parties, however, did not brief this matter and thus the Court refrains from ruling on it.

## VIII.   MISAPPROPRIATION OF INTELLECTUAL PROPERTY

In Texas, misappropriation of intellectual property requires that "(1) the idea is novel; (2) disclosure of the idea was made in confidence; and (3) the idea was adopted and made use of by the defendant."  *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir. 1984).  Mr. Elmore cites no New Mexico authority to support his claim for misappropriation of intellectual property (*see* Doc. 46 at 19–20), and the Court can only find one passing reference to the claim involving New Mexico law.  *See Chavez v. Kincaid*, 15 F. Supp. 2d 1118, 1122 n.6 (D.N.M. 1998) (refusing to discuss the elements of such a claim).

Even if New Mexico law recognizes misappropriation of intellectual property, Mr. Elmore does not allege facts to allow the court to reasonably infer such a claim here.  As discussed earlier, Mr. Elmore has not alleged that Harvard's contract with the other author has resulted in any actual use of Mr. Elmore's intellectual property.  *See supra* Section VII. Similarly, the alleged contract between the other author and Harvard does not indicate that Harvard has actually adopted Mr. Elmore's ideas.  After all, Harvard refused to publish Mr. Elmore's manuscript after signing an initial contract.  (*See* Doc. 22-2.)  Thus, Mr. Elmore fails to allege facts to support the third element of Misappropriation of Intellectual property.  *See Apple Barrel Prods., Inc.*, 730 F.2d at 389.  Similarly, Mr. Elmore has not alleged any facts to support a plausible claim that Harvard "made use" of Mr. Elmore's ideas when it caused Amazon to remove Mr. Elmore's book from Amazon's website.  *Id.*  Unlike the conversion claim, which only requires that Harvard defied Mr. Elmore's rights, misappropriation of intellectual property actually requires that Harvard "made use" of the idea.  *Id.*  Consequently, the Court will dismiss this claim.

## IX.    PRIMA FACIE TORT CLAIM

A prima facie tort requires: (1) "[a]n intentional, lawful act by defendant;" (2) "[a]n intent to injure the plaintiff;" (3) "[i]njury to plaintiff"; and (4) "[t]he absence of justification or insufficient justification for the defendant's acts." *Schmitz v. Smentowski*, 785 P.2d 726, 734 (N.M. 1990). "[T]he value and validity of prima facie tort as a separate cause of action depends upon its ability to offer relief for the intentional infliction of harm where the actor's otherwise lawful conduct cannot be brought within other more traditional categories of liability." *Hill v. Cray Research, Inc.*, 864 F. Supp. 1070, 1080 (D.N.M. 1991). Still, "a prima facie tort claim may not be used as a means of avoiding the more stringent requirements of other torts." *Healthsource, Inc. v. X-Ray Assocs. of N.M.*, 116 P.3d 861, 872 (N.M. Ct. App. 2005). However, summary judgment on a prima facie tort claim is inappropriate if the claim rests on an issue of intent and discovery is incomplete. *Diversified Dev. & Inv., Inc. v. Heil*, 889 P.2d 1212, 1222 (N.M. 1995).

Here, Mr. Elmore's claim for prima facie tort merely incorporates the facts from the rest of the counterclaim and restates the elements. (*See* Countercl. ¶¶ 70–74.) Thus, Mr. Elmore's claim fails, not because of an insufficient allegation to meet an element of the prima facie tort, *see Diversified Dev. & Inv., Inc.*, 889 P.2d at 1222, but rather because this claim would effectively allow Mr. Elmore to evade elements of other claims, *see Stock*, 964 P.2d at 137. If the Court allowed this claim, Mr. Elmore could circumvent the requirements of tortious interference with prospective contractual relations, *see supra* Section VI (determining no facts to show that Harvard used improper means or that Harvard's sole motive was improper), and misappropriation of intellectual property, *see supra* Section VIII (determining no facts to show

Harvard adopted or made use of Mr. Elmore's idea).  Consequently, the Court must dismiss this claim.

## X.     UNJUST ENRICHMENT

For unjust enrichment, a plaintiff must show: "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust."  *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 698 (N.M. Ct. App. 2000).

According to Mr. Elmore, Harvard knowingly benefitted at Mr. Elmore's expense (Countercl. ¶ 76), because "as a result of the breach" of their contract, Mr. Elmore identified artifacts in the Keam collection, Harvard claims ownership to copyrights, and Mr. Elmore thanked Harvard in his book.  (*Id.* at ¶¶ 9, 14, 30; Doc. 46 at 23.)  None of the supposed benefits actually resulted from Harvard's breach of the contract.  Instead, they resulted from Mr. Elmore's decision to publish his work after Harvard declined to publish it.  (*See* Countercl. ¶ 20.) Thus, these facts fail to indicate that Harvard benefited at Mr. Elmore's expense.  Secondly, Mr. Elmore has not alleged that Harvard has benefitted from its claimed ownership to copyrights in Mr. Elmore's book.  Indeed, these claimed rights are still the subject of this litigation.  (*See id.* at ¶¶ 78–82.)  Finally, Mr. Elmore has not pled any facts to indicate that praise for his book has positively impacted Harvard in any specific way.  (*See id.*)  Given Harvard's attempts to prevent sales of the book (*see id.* at ¶ 80), no facts support a plausible claim that Harvard knowingly benefits from acknowledgements in the book.  Consequently, the Court dismisses Mr. Elmore's claim for unjust enrichment.

## XI.    PUNITIVE DAMAGES

In New Mexico, "the plaintiff must establish a cause of action before punitive damages can be awarded."  *Sanchez v. Clayton*, 877 P.2d 567, 573 (N.M. 1994) (quoting 1 Dan B. Dobbs, *Law of Remedies* § 3.11(10), at 515–16 (2d ed. 1993)).  "A punitive damage claim is not an

independent cause of action or issue separate from the balance of a plaintiff's case." *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1554 (10th Cir. 1991) (discussing Kansas law).  Punitive damages rely on a determination of liability, at which point a trier of fact may decide that the defendant's conduct was "gross, willful, wanton or malicious."  *Id.* (regarding retrial of punitive damages upon remand); *see also Sussex Drug Prods. v. Kanasco, Ltd.*, 920 F.2d 1150, 1155 (3d Cir. 1990) (regarding certification for appeal); *Ariz. State Carpenters Pension Trust Fund v. Miller*, 938 F.2d 1038, 1040 (9th Cir. 1991) ("[A] complaint asserting only one legal right, even if seeking multiple remedies for the alleged violation of that right, states a single claim for relief.") (quoting *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 743 n. 4 (1976)).

"However, an inappropriately pleaded request for punitive damages as an independent cause of action is not dispositive of dismissal." *Simantob v. Mullican Flooring, L.P.*, No. 2:09CV379DAK, 2010 WL 2486549, at *3 (D. Utah June 15, 2010).  A court may allow the claim for punitive damages to proceed if the claim can be "tied to another claim." *Id.*  In New Mexico, punitive damages are available in certain contract claims. *See Romero v. Mervyn's*, 784 P.2d 992, 998 (N.M. 1989) (discussing breaches where the defendant's actions are malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights).  New Mexico also allows punitive damages for intentional torts, *Sanchez v. Clayton*, 877 P.2d 567, 573 (N.M. 1994), and in equity, *Madrid v. Marquez*, 33 P.3d 683, 686 (N.M. 2001) (quoting Gerald J. Robinson, *Punitive Damages in Equity,* 16 Md. L.Rev. 68, 73 (1956)).

Mr. Elmore's claims for breach of contract, breach of good faith and fair dealing, tortious interference of an existing contract, and conversion all survive Harvard's motion to dismiss for failure to state a claim upon which relief may be granted.  To the extent that Mr. Elmore's claims

for punitive damages may be tied to these claims, his claim for punitive damages survives this motion to dismiss.  *See Simantob*, 2010 WL 2486549, at *3.

## XII.   CONCLUSION

The Court grants Harvard's motion to dismiss in part.  Mr. Elmore's contract claims regarding the alleged contract with another author are dismissed without prejudice because they are premature.  *See infra* Section III.  The Court dismisses other claims with prejudice.  The Court grants Harvard's motion as to Mr. Elmore's claim for tortious interference of prospective contractual relations, because Mr. Elmore fails to state facts to indicate that Harvard used an improper method for interfering or had a sole improper motive for interfering.  *See infra* Section VI.  Mr. Elmore's claim for misappropriation of intellectual property fails because Mr. Elmore does not allege facts to support a plausible claim that Harvard adopted or made use of Mr. Elmore's idea.  *See infra* Section VIII.  His claim for prima facie tort fails because it would only serve to circumvent elements of other claims.  *See infra* Section IX.  Mr. Elmore's claim for unjust enrichment fails because he fails to allege facts to support a plausible claim that Harvard knowingly benefitted at Mr. Elmore's expense.  *See infra* Section X.  Lastly, Mr. Elmore's claim for punitive damages fails to the extent that it applies to these dismissed claims.  *See infra* Section XI.

Some of Mr. Elmore's claims survive.  Mr. Elmore's breach of contract claim states a plausible claim to the extent that Mr. Elmore alleges Harvard failed to reimburse Mr. Elmore's travel expenses.  *See infra* Section III.  Similarly, Mr. Elmore's claim for breach of good faith and fair dealing survives regarding Mr. Elmore's allegation that Harvard convinced him to rewrite his manuscript so Harvard could use his methodology and research for a contract with a different author.  *See infra* Section IV.  Mr. Elmore also states a plausible claim that Harvard interfered with Mr. Elmore's contract with Amazon, because Mr. Elmore alleges facts to indicate

Havard's primary motive was to use Mr. Elmore's research to publish a book with a different author.  *See infra* Section V.  Mr. Elmore's claim for conversion survives to the extent he alleges Harvard defied Mr. Elmore's rights to his manuscript by causing Amazon to remove his book from Amazon's website.  *See infra* Section VII.  Lastly, Mr. Elmore's claim for punitive damages survives to the extent that it applies to the surviving claims for contract, good faith and fair dealing, tortious interference of an existing contract, and conversion.  *See infra* Section XI.

 **THEREFORE**,

 **IT IS ORDERED** that Plaintiff's Motion to Dismiss Defendant Steve Elmore's Counterclaims (Doc. 37) is **GRANTED** in part.  The portion of Count I that relates to a contract with another author is dismissed without prejudice, and Counts IV (tortious interference with prospective contractual relations); VI (misappropriation of intellectual property); VII (prima facie tort); VIII (unjust enrichment) and portions of Count X (punitive damages relating to these claims) are **DISMISSED** with prejudice.  Plaintiff's Motion to Dismiss Defendant Steve Elmore's Counterclaims (Doc. 37) is **DENIED** as to Counts I (breach of contract); II (breach of implied covenant of good faith and fair dealing); III (tortious interference with prospective contractual relations), V (conversion), and the rest of Count X (punitive damages relating to these claims) as discussed in Section XII.

<br>

 **ROBERT C. BRACK**
 **UNITED STATES DISTRICT JUDGE**