IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,

      Plaintiff,

v.                                                                          No. CIV 15-00472 RB/KK

STEVE ELMORE, STEVE ELMORE
PHOTOGRAPHY, INC., d/b/a STEVE ELMORE
INDIAN ART, and d/b/a SPIRIT BIRD PRESS,

      Defendants.


SEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on Plaintiff's Motion for Partial Summary Judgment

on Contract Interpretation (Doc. 164) and Plaintiff's Motion to Strike Defendant's Response in

Opposition to Plaintiff's Motion for Partial Summary Judgment on Contract Interpretation (Doc.

188).  Jurisdiction arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1121(a) pursuant to Harvard's

remaining Lanham Act claim and 28 U.S.C. § 1367(a) for pendant jurisdiction over the contract

claim.

President and Fellows of Harvard College (Harvard) moved for partial summary

judgment, claiming that Steve Elmore and Steve Elmore Photography (Mr. Elmore) violated the

photography agreement he signed before visiting Harvard's Peabody Museum of Archeology

---

[1] This memorandum opinion and order is sealed, as it discusses the contents of documents that
are sealed.  (*See* Docs. 181-1; 181-2.)  If the parties would like to have the opinion unsealed, they
may file an unopposed motion with the Court.

and Ethnology (the Museum).   (*See* Doc. 17 ¶¶ 55–56.)   Having reviewed the parties'

submissions and arguments, the Court **GRANTS** Plaintiff's Motion for Partial Summary

Judgment on Contract Interpretation (Doc. 164).   Consequently, the Court **DENIES** Plaintiff's

Motion to Strike Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary

Judgment on Contract Interpretation (Doc. 188) as moot.

## I.       FACTS IN THE LIGHT MOST FAVORABLE TO MR. ELMORE

As with many contract disputes, this case is as much about a relationship gone sour as it

is about conflicting interpretations of a series of contracts.   The relationship began with an

invitation, by the curator of collections at the Museum to Mr. Elmore, to submit a book proposal

to the Peabody Museum Press (the Press).   (Doc. 13-1 ¶ 11.)   "The Press is the publishing arm of

the [Museum,]" and "[b]oth the Museum and the Press are divisions of Harvard . . . ."   (Doc. 7 ¶

2.)   Mr. Elmore submitted his proposal to the Press and it was unanimously accepted.   (Doc. 13-1

¶ 11; Doc. 88, at 175:14–15.)

Enter the first contract: the Letter of Agreement.   (Doc. 22-1.)   In August 2010, Mr.

Elmore and the director of the Press, Joan Kathryn O'Donnell, signed the Letter of Agreement in

Santa Fe, New Mexico.   (Doc. 88, at 120:5–14, 176:20–21.)   The parties agreed to produce a

book for the Press provisionally titled *In Search of Nampeyo: the Apprenticeship of a Great Hopi*

*Artist*, which would discuss "selected pieces of pottery" in Harvard's Keam collection, held by

the Museum.   (*Id.*)   Mr. Elmore agreed to "write and deliver to [the Press] . . . a complete

manuscript ( . . . including front matter, text, bibliographic references, copies of illustrations, and

figure captions)" by March 31, 2012.   (Doc. 22-1, at 1.)   Mr. Elmore agreed to "work in

consultation with the Museum and the Press to select objects from the collection for illustration

in the volume[,]" and the Museum was to "handle all photography and produce any other needed

artwork for the volume." (*Id.*) Conversely, Mr. Elmore was responsible for "obtain[ing] any necessary permissions for the use of material owned by others" and agreed to "submit copies of all permissions, as well as credit lines covering the materials, to the Press." (*Id.*) The parties agreed the manuscript would be a "Work Made for Hire as such term is used and defined in the United States Copyright Act." (*Id.*) As such, Mr. Elmore agreed "to grant, assign, and transfer to [Harvard] all publication rights to the manuscript and book, including all rights of copyright." (*Id.*) The Museum agreed "to provide Mr. Elmore with up to $1,500.00 in expense reimbursement for a research visit to the Museum" and "$1,000.00 upon completion and acceptance of the manuscript following peer review." (*Id.*)

In furtherance of this agreement, Mr. Elmore contacted Ms. O'Donnell regarding a trip to the Museum to research the Keam Collection and take photographs. (Docs. 7 ¶ 5, at 2–3, 9–10; 88, at 177:5–9.) Mr. Elmore asked Ms. O'Donnell if he could "speak with the photographer" about arranging the pottery for photographs during his visit. (Doc. 7, at 10.) Ms. O'Donnell explained that the Museum wouldn't "do photography for the book until the manuscript is delivered and accepted . . . ." (*Id.* at 9.) Ms. O'Donnell suggested Mr. Elmore check with Susan Haskell, Curatorial Associate for the Museum, about "taking record shots . . . , which could be useful when we work with the studio photographer." (*Id.* at 9; Pl.'s Prelim. Inj. Exs. 6; 12.) Ms. O'Donnell also stated "I have no idea what the Collections people allow in terms of making record shots, so you'll have to take it up with them." (Doc. 7, at 9.)[2]

---

[2] In Mr. Elmore's statement of Undisputed Facts, he asserts that "[w]hen working as a 'Work Made for Hire' [sic] there is no need to execute a Photography Agreement because any photographs taken by an employee as a Work Made for Hire are owned by Harvard." (Doc. 180 ¶¶ 6, 23 (citing Steven LeBlanc Dep., available at Doc. 223-3, at 37:10–38:2).) Even if Mr. Elmore correctly attributed this statement to Mr. LeBlanc, it would not be an admissible statement of fact, as it states an interpretation of law. *See* Fed. R. 56(c)(4) ("A[] . . . declaration

Enter the second contract: The Photography Agreement.  (Doc. 1-1.)  About a month before Mr. Elmore's visit, Ms. Haskell sent Mr. Elmore a form entitled "Permission to Photograph Collections" (Photography Agreement).  (Pl.'s Prelim. Inj. Ex. 12; Doc. 180 ¶ 4.) Ms. Haskell sent it with the hope that the contract "would answer some of [Mr. Elmore's] questions" and told Mr. Elmore he "could certainly take record shots for [himself] and for the photographer."   (Pl.'s Prelim. Inj. Ex. 12; Doc. 180 ¶ 4.)   By signing the Photography Agreement, Mr. Elmore agreed not to publically exhibit or reproduce any photographs he took at the Museum, absent enumerated exceptions, "without prior written permission of the Museum . . . ."  (Doc. 1-1.)  One of the enumerated uses in the agreement was the "circulation of pre-publication research materials to colleagues . . . ."  (*Id.*)  Immediately following the enumerated exceptions, the contract provided:

> I understand and agree that any other use of these photographs will require the prior written permission of the Museum and shall be governed by the photographic policies of the Peabody Museum and Harvard University.
> All uses of these photographs should include the full museum number and the credit line "Courtesy of the Peabody Museum of Archeology and Ethnology, Harvard University."

If Mr. Elmore breached the agreement, he agreed to pay Harvard "the sum of $10,000 as liquidated damages" and, in addition, Harvard could "specifically enforce the obligations set forth" in the agreement through a court of competent jurisdiction.  (*Id.*)  Mr. Elmore signed the Photography Agreement at home in Santa Fe about two weeks before visiting the Museum. (Docs. 1-1; 7, at 9; 88, at 148:5–12.)

---

used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

4

During this time, Harvard maintained a website entitled "Photographs of Peabody Collections[,]" which stated that "[t]he procedure for seeking permission [to use a researcher's own photographs of the collection] involves *a review of the photograph quality and the **transfer of copyright for that photo to the Peabody Museum***."  (Pl.'s Prelim. Inj. Ex. 18.)  No one from the Museum or Press attached these procedures to the Photography Agreement or provided them to Mr. Elmore.  (Docs. 88, at 75:23–76:4; 180-3 ¶¶ 8–9.)  Mr. Elmore believed that the "photographic policies of the Museum and Harvard University" were simply the requirements to obtain written permission and provide citations and credit as outlined in the Photography Agreement.  (Doc. 180-3 ¶ 13.)

When Mr. Elmore visited the Museum, he "showed up, prepared to do professional photography."  (Doc. 88, at 177:5–6.)  He "worked closely with [Ms.] Haskell, who handled the photography with [Mr. Elmore] and assisted [Mr. Elmore] in making the original arrangements of the ceramics that would convey [Mr. Elmore's] ideas clearly to the reader."  (*Id.* at 177:6–9.)  After the visit, but before Mr. Elmore submitted his first draft, Ms. O'Donnell reminded Mr. Elmore that photography wouldn't be done until "a manuscript has been submitted, peer reviewed, and revised" and suggested that Mr. Elmore "use record shots/photocopies as placeholders for what [Mr. Elmore] want[ed] illustrated."  (Pl.'s Prelim. Inj. Ex. 13, at 1.)  Mr. Elmore included the photographs he took during his visit in both versions of the manuscript that he submitted to the Press.  (*See* Doc. 13-1 ¶ 16; *see also, e.g.*, Def.'s Prelim. Inj. Exs. F, at 105; G, at 83–94.)

Mr. Elmore submitted his first version of the manuscript to Harvard on May 10, 2012.  (Doc. 13-1 ¶ 14.)  Three anonymous academic readers reviewed the manuscript.  (*Id.* ¶ 15.)  One recommended accepting it without revision, the second reviewer recommended accepting it with

revisions, and the third reviewer recommended rejecting it.  (*Id.*)  The Press's Editorial Advisory Board (the Board) evaluated the peer reviews and decided the manuscript could not be published without revision.  (Doc. 7 ¶ 4.)  Ms. O'Donnell instructed Mr. Elmore to "write lengthy responses to the questions and criticisms of the three anonymous reviewers."  (Doc. 13-1 ¶ 15.)  During that process, Mr. Elmore indicated he'd like to "tighten the photos [he] originally created for the book[,]" noted that "recreating the[] photos precisely will require some tight supervision[,]" and asked about the budget for the photography.  (Doc. 164-1, at 2.)  In November 2013, Mr. Elmore submitted a second version of the manuscript.  (Doc. 13-1 ¶ 16.)  After Mr. Elmore submitted the second version, he asked Ms. O'Donnell to check with another Press employee about the "publication quality" of two of his photographs.  (Doc. 103-4.)  The Press employee determined that the photographs would have "adequate resolution" if printed at certain sizes.  (*Id.*)  Unfortunately for Mr. Elmore, the Board reached consensus to "reject the project[,]" subject to a final review by the Museum Director and Ms. O'Donnell, in December 2013.  (Doc. 181-1, at 2.)  The Board further concluded, subject to the final decision of the Museum Director and Ms. O'Donnell, that there was "no reason to obstruct [Mr. Elmore's] use of [Museum] images" if printed elsewhere.  (*Id.*; *see also* Doc. 181-2, at 1.)

Ms. O'Donnell informed Mr. Elmore of the Press's decision not to publish the work by hand delivering him a letter, dated January 21, 2014 (January 2014 Letter).  (Doc. 22-2.)  The letter provided "formal notification that the" Museum returned to Mr. Elmore "all rights in the manuscript . . . , including all versions of the manuscript submitted to [the Press]."  (*Id.*)  The Board recommended Mr. Elmore "find a magazine or trade publisher that specializes in Southwest Indian art to publish the work."  (*Id.*)  The Museum offered to provide Mr. Elmore, "without charge, 10 to 15 high-quality, existing Peabody photographs to use in such

publication." (*Id.*)  In the letter, Ms. O'Donnell did not specify whether the Museum's offer of

Peabody photographs was in addition to the photographs in the manuscript or as a substitute for

photographs in the manuscript.  (Doc. 230-1, at 159:21–160:7.)  Mr. Elmore did not have any

part in drafting this letter (*see* Doc. 88, at 115:7–8), and Mr. Elmore did not sign the letter (Doc.

22-2).

Mr. Elmore decided to publish his manuscript, entitled *In Search of Nampeyo: The Early*

*Years, 1875–1892*, through Spirit Bird Press, a subsidiary of Steve Elmore Indian Art.  (Doc. 13-

1 ¶¶ 21–22.)  Mr. Elmore did not contact Harvard for any additional photographs or for

permission to use the photographs he took during his visit to the Museum.  Still, Mr. Elmore

used, among other sources, the photographs he took during that visit.  (Doc. 88, at 155:10–23.)

At least one of these photographs, "Nampeyo's Jack in the Box" was not included in any version

of the manuscript provided to the Press for review.  (*Id.* at 161:14–24 (Mr. Elmore testifying that

"[t]his exact image was not used because I had to reduce the images from two to one") [3];

*compare* Def. Prelim. Inj. Ex. J, at 1 (showing two photographs of a jar with a wood figure) *with*

Supp. Ex. 1, at 177 (showing one photograph of a jar with a wood figure).)

---

[3] Mr. Elmore cites the above quoted testimony and testimony from publisher Mark Diederichsen
to support the proposition that this photograph "was included in one of Mr. Elmore's
manuscripts, and the photo was later photoshopped for inclusion in the final book." (Doc. 180,
at 19.)  Neither testimony, however, supports this proposition. (*See* Doc. 88, at 161:14–24; Doc.
180-1, at 297:23–298:14 (Mr. Diederichsen testifying only that Mr. Elmore took photographs
"for the manuscript, which [Harvard] returned").)  Moreover, Mr. Elmore failed to appropriately
dispute Harvard's statement of facts in his response to the partial motion for summary judgment.
(*Compare* Doc. 164 ¶ 17 (Harvard's assertion) *with* Doc. 180 ¶¶ 18–20 (Mr. Elmore's response
to Harvard's facts in Doc. 164 ¶¶ 16–18).)  *See* D.N.M.LR-Civ. 56.1(b) ("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted."). (*But
see* Doc. 191 (stating, in Mr. Elmore's Response in Opposition to Motion to Strike, that "every
fact not expressly admitted was denied with reference to the evidence supporting the denial").)

Mr. Elmore's published book contains various captions for the photographs. Most of Mr. Elmore's photographs include a figure number identifying the figure's order in the book, a brief description of the figure, and the credit "Keam Collection." (*See, e.g.*, Supp. Ex. 1, at 76–82, 85–86.) Others lack any information on the source of the image and the artifact (*see, e.g.*, *id.* at 90, 138), and still other photographs state "Peabody" after the description (*see, e.g.*, *id.* at 141, 149–54). In some copies of the book, Mr. Elmore included a separate, paper addendum, which states "photographs and illustrations courtesy of the Peabody Museum of Archaeology and Ethnology, Harvard University." (Pl.'s Prelim. Inj. Ex. 4; Doc. 180-3 ¶ 6.) The addendum then lists the photographs and illustrations, providing the museum numbers for objects pictured. (Pl.'s Prelim. Inj. Ex. 4; Doc. 180-3 ¶ 6.) Some of the numbers are incorrect, and two photographs are not credited in the addendum. (Pl.'s Prelim. Inj. Ex. 4; Supp. Ex. 1, at 79, 151.)

During the hearing for the preliminary injunction, Kara Schneiderman, Director of Collections at the Museum, testified about the damage that can occur when individuals violate the Photography Agreement. (*See* Doc. 88, at 28:11–14.) Harvard seeks to ensure that all photography of artifacts in the Museum "reflect[] positively" on the Museum, which is "one of the most important ethnological collections in the world . . . ." (*Id.* at 30:12–15.) Harvard controls photographs so people who see the photographs know that Harvard is "handling [its] reproductions professionally, . . . [and] caring for [its] objects." (*Id.* at 30:15–17.) According to Ms. Schneiderman, "[i]t's absolutely critical" that Harvard be able to enforce its Photography Agreement "when researchers use the collection," because otherwise Harvard would completely lose control over [its] collections and the ways in which they're reproduced." (*Id.* at 34:10–13.) Control over the collection "speaks to the [Museum's] core mission . . . , which is to preserve and interpret its collections." (*Id.* at 34:13–16.)

8

Harvard now seeks partial summary judgment against Mr. Elmore on Harvard's contract claim. Harvard asks that the Court rule Mr. Elmore violated the Photography Agreement as a matter of law and "is liable to Harvard in the sum of $10,000, and for such other and further relief as the Court may deem proper." (Doc. 164, at 14.) In a subsequent motion, Harvard alleges that Mr. Elmore's response to the motion for summary judgment violated D.N.M.LR-Civ. 7.5 and 10.1 because Mr. Elmore "substantially compresse[ed] character and line spacing" to exceed the page limit by 12 pages. (Doc. 188, at 2.) Harvard also alleges that Mr. Elmore violated D.N.M.LR-Civ. 56.1 by failing to appropriately number his undisputed facts and refer with particularity to the record. (*Id.* at 3.) As the Court grants Harvard's motion for partial summary judgment, Harvard suffers no prejudice from Mr. Elmore's violations, and the Court denies Harvard's motion to strike (Doc. 188) as moot.

Mr. Elmore's response to Harvard's motion for summary judgment boils down to one fundamental assumption: that rights to the manuscript, as contracted for by the parties, includes sole permission to publish photographs contained in the manuscript. (*See* Doc. 180 at 1.) Based on this assumption, Mr. Elmore argues that (1) all photographs, taken by Mr. Elmore, for the production of the manuscript were part of the Work Made For Hire as contracted by the parties (*id.* at 15–17); (2) as such, Harvard possessed exclusive rights to print the photographs and Harvard returned those rights to Mr. Elmore in the January 2014 Letter (*id.* at 17–19); (3) the January 2014 Letter was an accord and satisfaction (*id.* at 19–23); or alternatively (4) Harvard is bound by the January 2014 Letter by promissory estoppel (*id.* at 23–24); and (5) at a maximum, Harvard is limited to $10,000 total for any violations of the Photography Agreement (*id.* at 24). Mr. Elmore's argument fails because his initial assumption is faulty; the Letter of Agreement did not define manuscript rights to include permission to publish any photographs Mr. Elmore took

to include in versions of the manuscript.  *See infra* Section III(A).  As such, even if the Work

Made for Hire doctrine is applicable, it does not apply to the photographs.  *See id.*  Instead,

Harvard possessed a separate contractual right to preclude Mr. Elmore from publishing

photographs taken at the Museum absent certain conditions outlined in the Photography

Agreement.  *See infra* Section III(B).  Ergo, Harvard did not grant rights to publish those

photographs when it returned to Mr. Elmore rights to his manuscript in the January 2014 Letter.

*See infra* Section III(C).  Any reliance on the January 2014 Letter in publishing his photographs

was not reasonable.  *See id*.  As agreed by both parties, however, Harvard is limited to $10,000

in damages.  *See infra* Section III(D).

## II.      LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the

part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

Even so, summary judgment on any claim, defense or partial claim or defense is only appropriate

if "the movant shows that there is no genuine issue as to any material fact and the movant is

entitled to judgment as a matter of law."  *Id.*  A fact is material if it could influence the

determination of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

disagreement is genuine only "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  *Id.*  To apply this standard, courts "examine the record and all

reasonable inferences that might be drawn from it in the light most favorable to the non-moving

party."  *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009).

As noted in Rule 56, "[t]he movant bears the initial burden to show that no genuine issue

of material fact exists."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A party may carry

that burden by citing to specific portions of the record or by showing that the record contains no

admissible evidence to establish a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  "If shown, the burden shifts to the non-movant to present evidence showing a genuine issue of material fact." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  Mere allegations or denials based on the pleadings are insufficient to avoid summary judgment.  *Id.*  Additionally, "affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence . . . ."  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

## III.    DISCUSSION

When considering state law claims, federal courts apply the choice of law rules of the forum state.  *See Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 802 (10th Cir. 1998) (discussing diversity jurisdiction).  For contract claims, New Mexico generally applies the law of "the place where the contract was executed."  *Shope v. State Farm Ins. Co.*, 925 P.2d 515, 517 (N.M. 1996).  Here, both Ms. O'Donnell and Mr. Elmore signed the Letter of Agreement in New Mexico (Doc. 88, at 120:5–14; 176:20–21) and, just as importantly, Mr. Elmore signed the Photography Agreement in New Mexico (*see id.* at 148:5–12).  As the parties do not provide any argument for using any other states' laws, the Court will apply New Mexico contract law.

In most circumstances, "[c]ontract interpretation is a matter of law . . . ."  *Rivera v. Am. Gen. Fin. Servs., Inc.*, 259 P.3d 803, 812 (N.M. 2011); *see also Rummel v. Lexington Ins. Co.*, 945 P.2d 970, 984 (N.M. 1997) ("The interpretation of an insurance contract is a matter of law about which the court has the final word.").  In interpreting a contract, "the role of the court is to give effect to the intention of the contracting parties."  *Bogle Farms, Inc. v. Baca*, 925 P.2d 1184, 1190 (N.M. 1996).  The language of the contract is conclusive as long as it is not ambiguous. *Rivera*, 259 P. 3d at 812 (quoting *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993)).  Courts consider the language of the contract as a whole, but "every word,

phrase or part of the contract should be given meaning and significance according to its importance in the contract." *Shaeffer v. Kelton*, 619 P.2d 1226, 1229 (N.M. 1980). Courts favor "[a] reasonable construction of the usual and customary meaning of the contract language . . . ." *H-B-S P'ship v. Aircoa Hosp. Servs., Inc.*, 114 P.3d 306, 313 (N.M. Ct. App. 2005). Neither courts nor parties may create a new agreement by reinterpreting the contract, and courts "will not give effect to a party's undisclosed intentions . . . ." *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 860 (N.M. 2013) (quoting *Ponder v. State Farm Mut. Auto. Ins. Co.*, 12 P.3d 960, 965 (N.M. 2000)).

In circumstances where a contract is ambiguous and material evidence regarding the meaning of the contract is in dispute, interpretation becomes a question of fact. *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993). "A contract is ambiguous if separate sections appear to conflict with one another . . . ." *Heye v. Am. Golf Corp.*, 80 P.3d 495, 499 (N.M. Ct. App. 2003). A contract is also ambiguous if, based on the language in the contract and surrounding circumstances, "the contract is reasonably and fairly susceptible of different constructions . . . ." *Mark V, Inc.*, 845 P.2d at 1235. Thus, "New Mexico law . . . allows court[s] to consider extrinsic evidence to make a preliminary finding on the question of ambiguity" and, if the contract is not ambiguous, rule on the contract as a matter of law. *Id.*

"It is logical to assume that the parties to a contract know best what is meant by its terms, and that whatever is done by them during the performance of the contract is consistent with their intent and the meaning of the contract terms as understood by them." *Schultz & Lindsay Const. Co. v. State*, 494 P.2d 612, 613 (N.M. 1972) (noting that this method of interpretation "is particularly true as to the resolution of ambiguities and uncertainties of meaning" and where the

12

conduct predates the controversy). Where ambiguity exists, however, the contract's meaning is construed against the drafter. *Smith v. Tinley*, 674 P.2d 1123, 1125 (N.M. 1984).

### A. The Letter of Agreement

To interpret the Letter of Agreement, the Court must first consider the definition and limitations of a "work made for hire" under the Copyright Act, 17 U.S.C. §§ 101–1332 (2012). (*See* Doc. 180, at 15–17.) The statutory phrase "work made for hire" encompasses certain situations where "an employer or other person for whom the work was prepared is considered the author of the work for the purposes of [the Copyright Act] . . . and owns all of the rights comprised in the copyright" unless the parties agree otherwise in writing. 17 U.S.C. § 201(b). A work made for hire may be created where the work is "prepared by an employee within the scope of his or her employment" or where the work is "specially ordered or commissioned for use" in certain enumerated mediums and the parties agree, in writing, to consider the product a work made for hire. 17 U.S.C. § 101; *see also Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 116–17 (S.D.N.Y. 2012). Whoever holds the copyright has exclusive rights to, among other things, copy the work, distribute copies of the work to the public, and authorize others to distribute copies of the work to the public. 17 U.S.C. § 106.

Contracts disputes that involve works made for hire are still subject to contract law. *See Ausherman v. Stump*, 643 F.2d 715, 718 (10th Cir. 1981) (determining that "where an action is brought on a contract either to enforce the contract, or to annul it, the action arises on or out of the contract, and not under the patent laws, even though the contract concerns a patent right"); *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1051 n.9 (10th Cir. 2006) (noting that the situation in *Ausherman* was "analogous" to copyright jurisdiction). In *Rogers v. Yonce*, No. 07-CV-704-GKF-PJC, 2008 WL 2853207, at *5 (N.D. Okla. July 21, 2008), the Court determined that contract claims involving a copyright "generally arise under state law . . .

especially where the issue of ownership turns on the interpretation of a contract."  There, the

court held that the claim was based in contract where the contract stated both that all intellectual

property would be considered a "work made for hire" and that the company would be "co-

author" of such works.  *Id.* at \*2, \*6.  The Copyright Act did not resolve the issue, as the Act

only clarified that the parties could "agree in writing as to the authorship and ownership of any

works" and thus the Act only "reiterate[d] . . . the core issue[,]" which was "a matter of contract

law."  *Id.* at \*6.

The issue here is not jurisdiction, but this precedent underscores the importance of

contract law in resolving works made for hire.  For employee based works made for hire, such

works are limited to the scope of employment, 17 U.S.C. § 101, which may be defined by

contract.  For other works made for hire, the work must be "specially ordered or commissioned."

*Id.*  Clearly, contracts can define what encompasses a work made for hire.  *See* 17 U.S.C. §

201(b) (providing employer ownership of all rights comprised in the copyright "unless the

parties have expressly agreed otherwise in a written instrument"); *see also Rogers*, 2008 WL

2853207, at \*6.  Here, the Letter of Agreement states "[t]he manuscript will be considered a

Work Made for Hire[,]" and the manuscript includes "front matter, text, bibliographic references,

copies of illustrations, and figure captions."  (Doc. 22-1 at 2.)  Thus, if the work made for hire

doctrine applies to this situation, [4] it is confined to the manuscript as defined by the Letter of

Agreement.

---

[4] Harvard asserts, peripherally, that "Mr. Elmore's manuscript by statute cannot be a work [made] for hire" because Mr. Elmore was not an employee of Harvard and the intended book did not qualify under the enumerated mediums for works made for hire pursuant to written agreement.  (Doc. 189, at 7 & n.2.)  This argument rings true but, as Harvard acknowledges, misses the point.  (*Id.*)  Regardless of the specific term, the parties contracted to convey all rights

The Letter of Agreement is unambiguous; it does not grant to Harvard any rights to Mr. Elmore's photography. The Letter of Agreement grants Harvard rights to the manuscript, which includes only "copies of illustrations . . . ." (Doc. 22-1 at 1.) The word "copies" is particularly relevant in this context. *See Shaeffer*, 619 P.2d at 1229. Instructively, a copyright includes exclusive rights to make copies, while copies are merely "the material object[s.]" 17 U.S.C. §§ 101, 106. The transfer of rights to the manuscript granted Harvard copies of illustrations in the manuscript, not the right to make copies of those illustrations.

Instead, the Letter of Agreement set up a separate mechanism for Harvard to acquire rights to make copies of the illustrations in the manuscript. For existing illustrations, Mr. Elmore agreed to "obtain any necessary permissions for the use of material owned by others . . . ." (Doc. 22-1 at 1.) For new photographs of artifacts in the Museum, Mr. Elmore was to "work in consultation with the Museum and the Press to select objects from the collection for illustration in the volume[,]" but the Museum was to "handle all photography . . . ." (*Id.*) These provisions do not conflict with the contract's definition of manuscript, but rather support it. *C.f. Heye*, 80 P.3d at 499 (stating a contract is ambiguous where sections of the contract conflict with each other). The contract did not contemplate Mr. Elmore taking photographs for the manuscript, and clearly requires Mr. Elmore to obtain all permissions for illustrations in the manuscript not produced by the Museum. (*See* Doc. 22-1.) Harvard did not "specially order or commission" photographs from Mr. Elmore, and if Mr. Elmore was employed by Harvard, photographs were not included in his scope of employment. 17 U.S.C. § 101. The language in the contract is

---

in the manuscript to Harvard and thus, the relevant question becomes which works are contained within the manuscript for the purpose of Harvard's copyright.

unambiguous: the copyright to the manuscript did not include copyrights to photographs within the manuscript.

The circumstances surrounding the contract confirm the unambiguous transfer of rights to the manuscript as opposed to photographs within the manuscript. *See Mark V, Inc.*, 845 P.2d at 1235.  Prior to the controversy, both parties' actions and statements confirm this interpretation of the contract. *C.f. Schultz & Lindsay Const. Co.*, 494 P.2d at 613 (considering the parties' actions in performing the contract to interpret an ambiguous contract).  In advance of Mr. Elmore's trip to the Museum, he contacted Ms. O'Donnell to "speak with the photographer" for the manuscript.  (Doc. 7 at 10.)  Mr. Elmore signed the Photography Agreement, agreeing not to publically exhibit photographs without written permission and proper citation.  (Doc. 1-1.) Before submitting the second draft, Mr. Elmore discussed the budget for "tighten[ing]" and "recreating" the photographs he took.  (Doc. 164-1 at 2.)  After submitting the second draft, Mr. Elmore asked Ms. O'Donnell to determine whether two of the photographs could be used for publication.  (Doc. 103-4.)  Similarly, Ms. O'Donnell suggested Mr. Elmore "tak[e] record shots" (Doc. 7 at 9) and use his photographs as "placeholders" in the manuscript (Pl.'s Prelim. Inj. Ex. 13, at 1).  Additionally, Ms. O'Donnell referred Mr. Elmore to the Museum regarding permission for "making record shots . . . ."  (Doc. 7 at 9.)  Lastly, the Board recommended allowing Mr. Elmore to use the Museum's images, not images Mr. Elmore took during his visit to the Museum.  (*See* Doc. 181-1 at 1.)  Clearly, all parties understood that Mr. Elmore's photographs would not be used in the published manuscript absent additional permission from the Museum.

The Court "give[s] effect to the intention of the contracting parties" by interpreting the Letter of Agreement to conclude the contract did not include rights to the photographs. *Bogle*

*Farms, Inc.*, 925 P.2d at 1190.  Based on the contract itself and the parties' actions, the contract was unambiguous.  Thus, the language of the contract is conclusive.  *Rivera*, 259 P. 3d at 812.  As a matter of law, the Letter of Agreement did not grant Harvard any rights to Mr. Elmore's photographs.  *See id.*

### B.  The Photography Agreement

With the rights of the parties clarified, the Court may now turn to the contract Harvard seeks to enforce: the Photography Agreement.  In this contract, Mr. Elmore agreed not to publically exhibit or reproduce any photographs he took at the Museum absent certain exceptions and preconditions.  (Doc. 1-1.)  The contract allowed Mr. Elmore to include copies of the photographs in his manuscript to the Press.  (*See id.* (allowing "circulation of pre-publication research materials to colleagues").)  The contract did not allow him to publish the photographs without, at least, obtaining written permission and including the full museum number and correct credit line for each photograph. [5]  (*Id.*)

Mr. Elmore argues "there is no need to execute a Photography Agreement" when a person is creating works made for hire, "because any photographs taken by an employee . . . are owned by Harvard."  (Doc. 180 ¶¶ 6, 23.)  The Court need not determine whether this statement accurately reflects the law for works made for hire that are photographs, because the work made for hire in this case was a manuscript.  *See supra* Section III(A).  As such, the Letter of Agreement, which may have made the manuscript a work for hire, didn't change the Photography Agreement's impact on Mr. Elmore's right to publish his photographs.

---

[5] Harvard asserts that, additionally, Mr. Elmore needed to follow the procedure to seek permission outlined on Harvard's website. (*See* Doc. 164 at 10; Pl.'s Prelim. Inj. Ex. 18.)  Mr. Elmore contests this because Harvard cannot show that it ever provided Mr. Elmore with these procedures.  (*See* Doc. 180 at 22.)  The Court need not resolve this debate, as Mr. Elmore violated the conditions explicitly listed in the Photography Agreement.

### C.  The January 2014 Letter

Mr. Elmore argues that the January 2014 Letter provided the written permission required by the Photography Agreement to allow Mr. Elmore to publish his photographs, but this argument fails for at least three reasons.  First, the January 2014 Letter returned "all rights in the manuscript" (Doc. 22-2), which did not include any rights to Mr. Elmore's photographs, *see supra* Section III(A).  As such, the January 2014 Letter provided no permission regarding the photographs.  Second, Mr. Elmore published at least one photograph that was never included in any version of the manuscript.  (*See* Doc. 88 at 161:14–24.)  The January 2014 Letter certainly did not provide permission to publish this photograph when it returned rights to the manuscript.  Third, Mr. Elmore failed to follow the other elements required by the Photography Agreement.  Mr. Elmore initially published the book without the full museum number and credit line.  (*See* Doc. 180-3 ¶ 6 (noting that Mr. Elmore included the courtesy line information "in the first addendum to [his] book").)  Even after Mr. Elmore included the addendum, he failed to provide the required information for at least two photographs and provided incorrect museum numbers for other photographs.  (Pl.'s Prelim. Inj. Ex. 4; Supp. Ex. 1, at 79, 151.)  Each of these issues breached the contract.

Mr. Elmore further argues that the January 2014 Letter operated as an accord and satisfaction that discharged Mr. Elmore's obligations pursuant to the Photography Agreement. (Doc. 180 at 19–23.)  Even if the January 2014 Letter qualified as an accord and satisfaction,[6] this argument fails because the January 2014 Letter only granted rights to the manuscript.  *See supra* Section III(A).  Mr. Elmore received no rights to publish his photographs.  *Id.*

---

[6] Such a conclusion would be dubious.  *See Smith Const. Co. v. Knights of Columbus, Council No. 1226*, 519 P.2d 286, 288 (N.M. 1974) (concluding that an accord and satisfaction must include a condition that if the accord is accepted "it is to be in full satisfaction" of the claim). Mr. Elmore has pointed to no such language in the January 2014 Letter.

Mr. Elmore's promissory estoppel argument fails for similar reasons. Promissory estoppel requires:

> (1) An actual promise must have been made which in fact induced the promisee's action or forbearance; (2) The promisee's reliance on the promise must have been reasonable; (3) The promisee's action or forbearance must have amounted to a substantial change in position; (4) The promisee's action or forbearance must have been actually foreseen or reasonably foreseeable to the promisor when making the promise; and (5) enforcement of the promise is required to prevent injustice.

*Strata Prod. Co. v. Mercury Expl. Co.*, 916 P.2d 822, 828 (N.M. 1996). Here, Mr. Elmore's reliance on the January 2014 Letter to publish photographs restricted by the Photography Agreement was not reasonable. *See id.* (requiring that the "promisee's reliance on the promise must have been reasonable"). Additionally, Mr. Elmore's action to publish the photographs was not reasonably foreseeable to Harvard. *See id.* Harvard had no reason to believe that Mr. Elmore would not seek to use the free Museum images Harvard offered in the January 2014 Letter or seek permission to use his own photographs. As Mr. Elmore's reliance was neither reasonable nor reasonably foreseeable, his claim for promissory estoppel fails.

### D. Damages

"A liquidated damages clause 'applies when the parties to a contract have agreed in advance on the measure of damages to be assessed in the event of default.'" *Fort Knox Self Storage, Inc. v. W. Techs., Inc.*, 142 P.3d 1, 8, (N.M. 2006) *as corrected* (Aug. 29, 2006) (quoting *A Dictionary of Modern Legal Usage* 530 (2d ed. 1995)). Courts enforce liquidated damage provisions unless the "amount is so extravagant or disproportionate as to show fraud, mistake or oppression." *Gruschus v. C. R. Davis Contracting Co.*, 409 P.2d 500, 504 (N.M. 1965). The standard to evaluate this low bar is not the plaintiff's actual loss or injury, but rather "the loss or injury which might reasonably have been anticipated at the time the contract was made." *Id.*

Here, Harvard has presented sufficient, uncontroverted evidence that potential loss or injury is not so disproportionate to the liquidated damages provision "as to show fraud, mistake or oppression." *Gruschus*, 409 P.2d at 504. The Museum has "one of the most important ethnological collections in the world[,]" and the Museum's core mission is to "preserve and interpret" that collection. (Doc. 88, at 30:12–15, 34:13–16.) Harvard must be able to enforce its Photography Agreement to maintain that control. (*Id.* at 34:13–16.) As such, the Court determines that $10,000 is not "so extravagant or disproportionate as to show fraud, mistake, or oppression." *Gruschus*, 409 P.2d at 504.

## IV.   CONCLUSION

Mr. Elmore agreed to obtain permission and follow certain policies before publishing photographs he took at the Museum. He did not do so, and no contract or other document releases him from that obligation. Mr. Elmore further agreed to pay Harvard $10,000 in liquidated damages if he breached his agreement.

**THEREFORE**,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment on Contract Interpretation (Doc. 164) is **GRANTED** and judgment is entered against Mr. Elmore in the amount of $10,000. Plaintiff's Motion to Strike Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment on Contract Interpretation is **DENIED** as moot.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**