**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,

      Plaintiff,

v.                                                    No. 15-cv-00472 RB/KK

STEVE ELMORE, STEVE ELMORE
PHOTOGRAPHY, INC., d/b/a STEVE ELMORE
INDIAN ART, and d/b/a SPIRIT BIRD PRESS,

      Defendants.

**SEALED MEMORANDUM OPINION AND ORDER[1]**

    **THIS MATTER** is before the Court on Plaintiff's Partial Motion to Dismiss Defendant's Counterclaims (Doc. 196); Defendant Steve Elmore's Motion for Leave to Amend Counterclaim (Doc. 163); Defendant Steve Elmore's Motion to Reconsider (Doc. 162); and Plaintiff's Motion to Strike Defendant Steve Elmore's Consolidated Reply in Support of Motion to Reconsider and Motion for Leave to Amend Counterclaim (Doc. 195). Plaintiff President and Fellows of Harvard (Harvard) sued Steve Elmore for violation of copyright, false designation of origin, and breach of contract. (Doc. 1.) Harvard later amended its complaint to also include Steve Elmore Photography, which was responsible for publishing the book that gave rise to Harvard's claims. (*See* Doc. 17.) Steve Elmore and Steve Elmore Photography (collectively, Mr. Elmore) filed

---

[1] This memorandum opinion and order is sealed, as it discusses the contents of documents that are sealed. (*See* Docs. 181-1; 181-2.) If the parties would like to have the opinion unsealed, either may file an unopposed motion with the Court.

various counterclaims (Doc. 22), many of which the Court dismissed (*see* Doc. 137).  Now, Mr. Elmore seeks to reassert similar claims and add new claims through various procedural means. (*See* Docs. 162; 163; 178.)  Having reviewed the parties' submissions and arguments, the Court **GRANTS** Plaintiff's Partial Motion to Dismiss Defendant's Counterclaims (Doc. 196); **DENIES** Defendant Steve Elmore's Motion for Leave to Amend Counterclaim (Doc. 163); **DENIES** Defendant Steve Elmore's Motion to Reconsider (Doc. 162); and **DENIES** Plaintiff's Motion to Strike Defendant Steve Elmore's Consolidated Reply in Support of Motion to Reconsider (Doc. 188) and Motion for Leave to Amend Counterclaim (Doc. 195).

## I.    FACTUAL ALLEGATIONS

The facts in this case are well known to the parties.  For this motion, however, some of the facts have shifted based on Mr. Elmore's First Amended Counterclaim Against Harvard (Doc. 163-1).  As relevant to this motion, the alleged facts are set forth below:

Harvard originally invited Mr. Elmore to write the book that eventually caused this suit. In 2009, the curator of collections at the Peabody Museum of Archaeology and Ethnology (the Museum) invited Mr. Elmore to submit a book proposal to Peabody Museum Press (the Press). (Doc. 163-1 ¶ 8.)  At that time, Harvard was aware that Mr. Elmore was a dealer of Native American art.  (*Id.* ¶ 7.)  Mr. Elmore submitted his proposal to the editor and director of Press publications, Joan Kathryn O'Donnell, and the proposal was unanimously accepted "with enthusiasm."  (*Id.*)  In August 2010, Mr. Elmore and Harvard contracted to publish the book, provisionally titled *In Search of Nampeyo: the Apprenticeship of a Great Hopi Artist*.  (Doc. 163-1 ¶ 5; Doc. 22-1, at 1.)  The book would discuss "selected pieces of pottery" in Harvard's Keam collection, held by the Museum.  (Doc. 22-1.)

In the Letter of Agreement, attached to Mr. Elmore's original counterclaim and referenced in Mr. Elmore's amended counterclaim (*see* Doc. 163 ¶¶ 5–8), the parties agreed the manuscript would be a "Work Made for Hire."  (Doc. 22-1, at 2.)  Mr. Elmore agreed to "write and deliver to [the Press] . . . a complete manuscript ( . . . including front matter, text, bibliographic references, copies of illustrations, and figure captions)" by March 31, 2012.  (*Id.* at 1.)  Mr. Elmore agreed to "write the manuscript according to specifications on length and general content" contained in the Collection Series Writer's Guide and "work in consultation with the Museum and the Press to select objects from the collection for illustration in the volume."  (*Id.*)  The Museum was to "handle all photography and produce any other needed artwork for the volume."  (*Id.*)  The Press agreed to "manage editorial, design, and production work" for the book.  (*Id.*)  According to publishing industry standards, production includes "copyediting, design, typesetting, proofreading, and manufacturing."  (Doc. 163-1 ¶ 22.)  Production also includes "assisting the author throughout the development and production process, and assisting the author in creating a publishable manuscript."  (*Id.* ¶ 23.)

"If Mr. Elmore fail[ed] to submit the manuscript by [March 31, 2012], the Museum ha[d] the right to refuse publication of the work[,]" but the contract could also "be extended by mutual written agreement of the two parties."  (Doc. 22-1, at 2.)  The Museum agreed "to provide Mr. Elmore with up to $1,500.00 in expense reimbursement for a research visit to the Museum" and agreed to pay Mr. Elmore "$1,000.00 upon completion and acceptance of the manuscript following peer review."  (*Id.*)

As Mr. Elmore wrote his first draft, he "attempted to communicate with [Ms.] O'Donnell regarding the progress he was making on the manuscript and the development of the manuscript . . . ."  (Doc. 163-1 ¶ 28.)  Ms. O'Donnell was "consistently unavailable to assist Mr. Elmore, was

3

inconsistent in her remarks, and failed to return phone calls and e-mails." (*Id.* ¶ 28.)  On May 10, 2012, Mr. Elmore submitted the first version of his manuscript to Harvard.  (Doc. 163-1 ¶ 11.)  Ms. O'Donnell and three anonymous academic readers reviewed the first version of the manuscript.  (*Id.* ¶ 13.)  The standard practice in the publishing industry is to only use two peer reviews.  (*Id.* ¶ 20.)  Although one of the peer reviewers recommended accepting the manuscript without revision, the second reviewer recommended accepting it with revisions, and the third reviewer recommended rejecting it.  (*Id.*)  The peer reviewer who recommended rejecting the manuscript outright "was personally familiar with Mr. Elmore, and criticized Mr. Elmore personally and professionally as a dealer in Native American Art, but not for the scholarly quality of his manuscript." (*Id.* ¶ 14.)  The same peer reviewer asked Ms. O'Donnell if she was having difficulty finding the words "with which to reject" the manuscript and offered language Ms. O'Donnell could use to do just that.  (*Id.* ¶¶ 15–16.)

Ms. O'Donnell told the reviewer she needed clear arguments to convince the "Editorial Board" (the Board) to reject Mr. Elmore's manuscript and thanked the reviewer for his comments.  (Doc. 163-1 ¶¶ 17–18.)  She also expressed concern that other reviewers would not be as candid.  (*Id.* ¶ 18.)  Around the same time, Ms. O'Donnell contacted the director of the Museum and warned him to be wary of Mr. Elmore because he was a dealer of Native American art.  (*Id.* ¶ 64.)  Ms. O'Donnell expressed concern that Mr. Elmore's manuscript did not present "disinterested scientific research." (*Id.* ¶ 19.)  These comments effectively halted a film project Mr. Elmore was in the process of securing.  (*Id.* ¶¶ 64, 86.)  According to publishing industry standards, "an acquisitions editor has a duty to act as an advocate on behalf of the author in order to achieve the understood common purpose of publication." (*Id.* ¶ 22.)  Ms. O'Donnell did not

act as an advocate for Mr. Elmore, and instead decided to influence the Board to decline the publication.  (*Id.* ¶ 25.)

Even after Ms. O'Donnell decided to influence the Board, she instructed Mr. Elmore to "write lengthy responses to the questions and criticisms of the three anonymous reviewers." (Doc. 163-1 ¶ 13.)  Once the Board and Ms. O'Donnell reviewed Mr. Elmore's responses, they "recommended that Mr. Elmore rewrite the manuscript as a full academic paper for Harvard." (*Id.* ¶ 26.)  Someone from Harvard informed Mr. Elmore that the manuscript was "excellent academically, but too detailed for the regular Peabody Museum series . . . ."  (*Id.* ¶ 12.) "Harvard promised a second contract" but never provided one.  (*Id.* ¶ 26.)  Harvard never advised Mr. Elmore that "it had no intention of publishing his work."  (*Id.* ¶ 51.)

Absent the promised contract, Mr. Elmore worked on a second version of the manuscript. (Doc. 163-1 ¶¶ 26–27.)  During this time, Ms. O'Donnell was again unavailable, inconsistent, and unresponsive.  (*Id.* ¶ 28.)  Instead, Ms. O'Donnell was in discussions with author Lea McChesney "regarding a joint publication with Mr. Elmore concerning his thesis . . . , but Mr. Elmore was not informed of these negotiations."  (*Id.* ¶ 48.)  In November 2013, Mr. Elmore submitted a second version of the manuscript.  (Doc. 163-1 ¶ 27.)  After Mr. Elmore submitted the manuscript, Ms. O'Donnell "continually represented to Mr. Elmore that she fully expected Mr. Elmore's manuscript to be published."  (*Id.* ¶ 15.)  Harvard did not conduct an external peer review of this version of the manuscript, but instead provided Ms. O'Donnell with authority to decide whether to accept or reject Mr. Elmore's manuscript.  (*Id.* ¶¶ 31–32.)  Ms. O'Donnell rejected the manuscript.  (*Id.* ¶ 33.)

In January 2014, Ms. O'Donnell hand delivered a letter (January 2014 Letter) to Mr. Elmore, informing him that the Board reviewed the revised manuscript and "concluded that the

project [was] not a fit with [their] editorial and publishing priorities and standards." (Doc. 22-2.) Ms. O'Donnell wrote the January 2014 Letter, which "return[ed] . . . all rights in the manuscript[,] . . . including all versions of the manuscript submitted to the" Press and "recommend[ed] that [Mr. Elmore] find a magazine or trade publisher" to publish the manuscript. (Docs. 163-1 ¶ 36; 22-2.) Ms. O'Donnell noted she "would support publication" with the American Indian Art Magazine. (*Id.*)

"Upon information and belief, after realizing [its] error in not recognizing the importance of the work Mr. Elmore completed, Harvard scrambled to" assert rights to the manuscript.[2] (Doc. 163-1 ¶ 44.) In December 2014, Dr. McChesney approached Mr. Elmore, claiming she had "secur[ed] writing projects with Harvard and the Peabody on Nampeyo's ceramics in the Keam collection" and interrogated Mr. Elmore "specifically about the information in his manuscript . . . ." (*Id.* ¶ 45.) Based on this information, Mr. Elmore alleges "Harvard has contracted with [Dr. McChesney or another author] . . . for the publication of another book about Nampeyo and the Keam Collection, which relies on the original research conducted by Mr. Elmore, including but not limited to the results drawn therefrom . . . ." (*Id.* ¶¶ 49–50.) Mr. Elmore further asserts that Harvard and this author seek to attribute Mr. Elmore's thesis and work "as their own." (*Id.*)

---

[2] Mr. Elmore alleges "Harvard scrambled to reassert the rights it once had under the Work Made for Hire Agreement that were unambiguously returned to Mr. Elmore in the Formal Notification." (Doc. 163-1 ¶ 44.) This assertion contains legal conclusions that are not assumed true for the purpose of a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) ("A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth.") Here, as in other instances in the statement of facts not expressly identified, the Court only recounts asserted facts, as opposed to legal conclusions.

Mr. Elmore published his manuscript, now entitled *In Search of Nampeyo: The Early Years, 1875–1892*, through an independent publisher.  (Doc. 163-1 ¶ 43.)  The book was "well received by the Southwestern Indian art world" and received numerous favorable reviews and a silver medal in non-fiction from the Mountain West division of the Independent Book Publishers Association.  (*Id.* ¶ 43.)  Additionally, "[a] researcher recently visited the . . . Museum for the purpose of studying historic Hopi pottery with a focus on the early work of Nampeyo."  (*Id.* ¶ 59.)

Harvard sued Mr. Elmore, claiming he infringed on Harvard's copyrights by using certain illustrations in his book and that Mr. Elmore is not allowed to publish photographs he took at the Museum.  (*See* Doc. 163-1 ¶ 57.)  Harvard has thus "made extended efforts to ensure that Mr. Elmore not be allowed to sell his book[,]" by, among other means, causing Amazon.com to remove the published manuscript from their website.  (*Id.* ¶¶ 58, 63.)  Harvard also retains and refuses to return physical and electronic copies of Mr. Elmore's drafts.  (*Id.* ¶ 60.)  Additionally, Harvard has relied on Mr. Elmore's manuscripts and methodology to attribute pottery in its collection to the artist Nampeyo.  (*Id.* ¶ 61.)

## II.    PROCEDURAL HISTORY

As the parties know, the motions practice in this case has been extensive.  Excluding the majority of filings, the Court must still provide a short history lesson to recount those motions relevant to the issues before the Court.

Harvard filed its initial complaint on June 4, 2015.  (Doc. 1.)  Mr. Elmore moved to dismiss the complaint on July 16, 2015, noting in part that Harvard failed to include the entity responsible for publishing Mr. Elmore's book, Steve Elmore Photography.  (Doc. 13 at 1.)  On July 28, 2015, Harvard amended its complaint as a matter of right to correct this oversight.

(Docs. 17 at 1; 58 at 3.)  The next day, July 29, 2015, Mr. Elmore filed a motion to strike this amended complaint, arguing Harvard should have requested leave to file it.  (Doc. 20.)

Mr. Elmore answered Harvard's original complaint and asserted his counterclaims on August 4, 2015.  (Doc. 22.)  Harvard responded with a motion to dismiss and an answer to Mr. Elmore's counterclaims on September 4, 2015.  (Docs. 37; 38.)

On November 9, 2015, the Court ruled Harvard did not require leave to file its first amended complaint.  (Doc. 58 (addressing Docs. 17; 20).)  On December 4, 2015, Mr. Elmore attacked Harvard's first amended complaint again, this time moving to dismiss the complaint for failure to serve.  (Doc. 71.)  On December 7, 2015, the Court denied Mr. Elmore's motion (Doc. 20) to dismiss Harvard's original complaint, as it dealt with similar claims in state court that remained relevant to Harvard's amended complaint.  (Doc. 73.)  On April 22, 2016, the Court ruled on Harvard's motion to dismiss Mr. Elmore's counterclaim, dismissing with prejudice Mr. Elmore's claims for tortious interference of prospective contractual relations, misappropriation of intellectual property, prima facie tort, and unjust enrichment, and limiting Mr. Elmore's claims for breach of contract, breach of good faith and fair dealing, tortious interference with existing contractual relations, and conversion.  (Doc. 137.)  On May 13, 2016, Mr. Elmore filed a motion requesting that the Court reconsider its ruling on Harvard's motion to dismiss Mr. Elmore's counterclaim (Doc. 162) and a motion to amend his counterclaims (Doc. 163).  On May 19, 2016, the Court denied Mr. Elmore's earlier motion to dismiss Harvard's amended complaint for failure to serve.  (Doc. 165.)  Only then, on June 1, 2016, did Mr. Elmore file his answer to Harvard's first amended complaint, which included a new, expanded counterclaim.  (Doc. 178.)  Harvard seeks to dismiss Mr. Elmore's new counterclaim.  (Doc. 196.)  Motions

practice followed these various filings, and Harvard took issue with one of Mr. Elmore's replies. (Doc. 195.)

The Court now considers Mr. Elmore's motions to reconsider and for leave to amend his original counterclaims (Docs. 162; 163), Harvard's motion to dismiss Mr. Elmore's first amended counterclaim (Doc. 196), and Harvard's motion to strike Mr. Elmore's reply (Doc. 195).

Taking these motions out of order, the Court first grants Harvard's motion to dismiss Mr. Elmore's first amended counterclaim because Mr. Elmore failed to request leave from the Court. *See infra* Section III.  Next the Court denies Mr. Elmore's request for leave to amend his original counterclaims, as the request was unduly delayed and newly discovered asserted facts would be futile to remedy the claims.  *See infra* Section IV.  The Court denies Mr. Elmore's motion to reconsider as newly discovered evidence would not change the analysis and Mr. Elmore did not request leave to amend until after the Court dismissed his claims.  *See infra* Section V. Consequently, the Court denies, as moot, Harvard's motion to strike Mr. Elmore's reply.

## III.   HARVARD'S MOTION TO DISMISS

Federal Rule of Civil Procedure 15 is "the sole rule governing amendment of a pleading to add a counterclaim."  Fed. R. Civ. P. 15 advisory committee's notes to 2009 amendment. Rule 15 allows a defendant to amend counterclaims once as of right if amended "within 21 days after service of" an answer to the counterclaims or other motion filed under Rule 12(b), (e), or (f).  Fed. R. Civ. P. 15(a)(1)(B).  The 21 day limit for amendments as of right "force[s] the [defendant] to consider carefully and promptly the wisdom of amending to meet the arguments in [a challenging] motion."  Fed. R. Civ. P. 15 advisory committee's notes to 2009 amendment.  "In all other cases," a defendant must obtain either written consent from the plaintiff or leave from

the court to amend his counterclaims.  Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  *Id.*

Rule 15 also governs the timing for responses to amended complaints.  "Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later."  Fed. R. Civ. P. 15(a)(3).

Rule 15 does not distinguish between a defendant's independent decision to amend counterclaims and a defendant's decision to amend counterclaims in response to an amended claim.  *See* Fed. R. Civ. P. 15(a)(1), (3); *see also Bern Unlimited, Inc. v. Burton Corp.*, 25 F. Supp. 3d 170, 177 (D. Mass. 2014) ("Although [Rule] 15(a)(3) addresses *when* an answer to an amended complaint must be filed, it does not address whether the defendant is required to obtain leave of court if it is not simply filing a new answer, but also asserting new or amended counterclaims.")  Many courts have grappled with whether a plaintiff's amended complaint automatically grants a defendant an opportunity to substantively amend counterclaims as of right.  *See Hydro Eng'g, Inc. v. Petter Investments, Inc.*, No. 2:11-CV-00139-RJS, 2013 WL 1194732, at *2 (D. Utah Mar. 22, 2013).

To this Court's knowledge, the Tenth Circuit has not resolved this issue.  *See id.* ("No appellate courts have directly addressed this situation."); *Lawlis v. Moore Iron & Steele Corp.*, No. CIV-13-823-D, 2014 WL 7403854, at *2 (W.D. Okla. Dec. 30, 2014) ("The Court has not found any Tenth Circuit authority addressing the precise issue before it—whether Defendant may file amended counterclaims *as of right* in response to Plaintiff's Second Amended Complaint."); *Port-A-Pour, Inc. v. Peak Innovations, Inc.*, No. 13-CV-01511-WYD-BNB, 2016 WL 1258552, at *2 (D. Colo. Mar. 31, 2016) ("As Plaintiff recognizes, the Tenth Circuit has not

appeared to address whether a defendant may file amended counterclaims and new affirmative defenses as of right in response to an amended complaint or whether and to what extent they must comply with Rule 15.").

Federal district courts have done their best to fill the void and have come up with a "wide range of positions" to decide whether a defendant must seek leave to amend counterclaims in response to an amended complaint.  *Hydro Eng'g*, 2013 WL 1194732, at *2.  Some courts in other circuits, use "the so-called permissive approach, [which allows] a defendant served with an amended complaint [to] amend [his] answer without leave of court, regardless of the scope of the changes in the amended complaint." *Id.*  The moderate approach, used by some courts in this circuit, allows a defendant to amend counterclaims "[w]hen a plaintiff files an amended complaint which changes the theory or scope of the case . . . ." *Id.* (quoting *Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 832 (N.D. Iowa 1997), *aff'd*, 205 F.3d 1347 (8th Cir. 2000)). Other courts use the narrow approach, which only allows amended counterclaims as of right if the amendments "directly relate to the changes in the amended complaint." *Id.*  Still other courts, including ones in this district, rely on the advisory committee's notes to the 2009 amendments to "simply apply the Rule 15 standard equally to amended complaints and amended (or new) counterclaims." *Digital Ally, Inc. v. DragonEye Tech., LLC*, No. 13-CV-2290 CM/TJJ, 2014 WL 2865592, at *3–4 (D. Kan. June 24, 2014) (quoting *Bern Unlimited*, 25 F. Supp. 3d at 177).  In these courts, defendants must always request leave of the court or written consent from opponents to amend counterclaims.  *Id.*  As always, courts must allow such amendments "when justice so requires."  Fed. R. Civ. P. 15(a)(2).

The correct interpretation of a defendant's right to amend has real world implications. "[I]f every amendment, no matter how minor or substantive, allowed defendants to assert

counterclaims or defenses as of right, claims that would otherwise be barred or precluded could be revived without cause.  This would deprive the Court of its ability to effectively manage the litigation." *Hydro Eng'g*, 2013 WL 1194732, at *4 (quoting *E.E.O.C. v. Morgan Stanley & Co.*, 211 F.R.D. 225, 227 (S.D.N.Y. 2002)).  Resolution in this case, however, does not hinge on this issue, as Mr. Elmore's claims fail under any of the aforementioned interpretations.

In all approaches but the permissive one, resolution is clear.  As Harvard only amended its complaint to allege the same claims against Steve Elmore Photography that it previously alleged against Mr. Elmore (*see* Doc. 17 at 1), the amendment changed neither the theory nor scope of the case.  *C.f. Hydro Eng'g*, 2013 WL 1194732, at *4 (noting plaintiff's additional 39 pages, which added two new defendants and new claims against the original defendant, expanded the scope and theory of the case).  Even more obviously, Mr. Elmore's amended counterclaim does not "directly relate to" Harvard's addition of Steve Elmore Photography.  *Id.* (*See, e.g.*, Doc. 178, at 39–40 (alleging violation of the Digital Millennium Copyright Act  and claiming injury including Mr. Elmore's "financial and personal expenses" and "harm to his free speech rights").)  Similarly, Mr. Elmore fails the approach followed in *Digital Ally*, 2014 WL 2865592, at *3–4, and *Bern Unlimited*, 25 F. Supp. 3d at 177, because this approach requires that all defendants request leave to substantively amend their counterclaim.  Mr. Elmore did not do so for this version of his amended counterclaim (*see* Doc. 178 at 1 n.1), but instead requested leave to amend an earlier version of his counterclaim (Docs. 163, 163-1).  *See supra* Section IV. Consequently, pursuant to the moderate, narrow, and *Bern Unlimited* approaches, Mr. Elmore had no claim as of right to amend his counterclaim.

Even under the permissive approach, Mr. Elmore's amendment is untimely.  Absent permission from the court, Rule 15(a)(3) requires a defendant respond to an amended complaint

either "within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later."  Harvard filed its complaint on June 4, 2015, and its amended complaint on July 28, 2015.  Fourteen days after service of the amended pleading would have been August 11, 2015.[3]  The time remaining to respond to the original pleading, however, was longer.  The Court denied Mr. Elmore's motion to dismiss Harvard's original complaint on December 7, 2015.  (Doc. 73.)  Federal Rule of Civil Procedure 12(a)(4) postpones the deadline for answering a complaint when a defendant files a motion under Rule 12 to fourteen days after the court denies the motion.  Thus, Mr. Elmore had until December 21, 2015, to respond to Harvard's Amended Complaint.  As Mr. Elmore waited until June 1, 2016, his amended counterclaim is untimely.

Mr. Elmore instead requests that the Court apply only Rule 12(a)(4), without Rule 15, to determine the deadline for Mr. Elmore's answer and counterclaim to Harvard's amended complaint.  (Doc. 178, at 1 n.1.)  Rule 12, however, does not supersede Rule 15, which governs all amended complaints and counterclaims.  *See* Fed. R. Civ. P. 15 advisory committee's notes to 2009 amendment (stating Rule 15 is "the sole rule governing amendment of a pleading to add a counterclaim").  Additionally, Mr. Elmore's amendment is untimely pursuant to Rule 12(a)(4).  Mr. Elmore's motion to dismiss for failure to serve was not his first motion challenging Harvard's Amended Complaint pursuant to Rule 12.  (*See* Doc. 20.)  Mr. Elmore first sought to strike Harvard's Amended Complaint on July 29, 2015.  (*Id.*)  The Court ruled on that motion on November 9, 2015.  (Doc. 58.)  Even if Rule 12(a)(4) had applied, the deadline would have been

---

[3] The Court notes that, pursuant to Federal Rules of Civil Procedure 5(b)(2)(F) and 6(d), some of the deadlines in this section would technically accrue three days later.  (*See* Doc. 9.)

November 23, 2015.  As Mr. Elmore waited until June 1, 2016, his amended counterclaim is still untimely.

## IV.     MR. ELMORE'S MOTION FOR LEAVE TO AMEND

A party may amend its pleadings once as a matter of course and otherwise "only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a).  "[T]his mandate is to be heeded."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  "If the underlying facts or circumstances relied upon by a [claimant] may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Id.*  Even so, "the grant or denial of an opportunity to amend is within the discretion of the [d]istrict [c]ourt," as long as the court justifies its rationale.  *Id.*  Courts may deny leave to amend for reasons including undue delay and futility.  *Id.*

"While Rule 15 governs amendments to pleadings generally, [Federal Rule of Civil Procedure] 16(b) governs amendments to scheduling orders."  *Bylin v. Billings*, 568 F.3d 1224, 1231 (10th Cir. 2009).  For each case, a district court must enter a scheduling order that sets all pre-trial case management deadlines.  Fed. R. Civ. P. 16(a); N.M.LR-Civ. 16.1.  Such deadlines include motions for leave to amend claims pursuant to Rule 15(a)(2).  *See Bylin*, 568 F.3d at 1231.  Once set, such deadlines cannot be modified without "a showing of good cause and Court approval."  N.M.LR-Civ. 16.1; *see also* Fed. R. Civ. P. 16(f); *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1518 (10th Cir. 1990).

Mr. Elmore moved for leave to amend his counterclaim on May 13, 2016.  As Mr. Elmore specifically requested leave for this version of his amended counterclaim, the Court will

not consider Mr. Elmore's answer to Harvard's amended complaint, discussed in Section III, as a motion for leave to amend.

### A.  Good Cause and Undue Delay

For undue delay, "denial of leave to amend is appropriate 'when the party filing the motion has no adequate explanation for the delay.'"  *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (quoting *Frank v. U.S. West*, 3 F.3d 1357, 1365–66 (10th Cir.1993)).  To assess delay, courts consider the age of the complaint, previous court decisions, proximity of trial, and when the movant became aware of facts giving rise to the claim.  *See Las Vegas Ice & Cold Storage Co. v. Far W. Bank*, 893 F.2d 1182, 1184 (10th Cir. 1990) (noting movant sought to amend a year and a half after filing the complaint, nine months after partial summary judgment, and a few months before trial, and emphasizing that movant knew the facts underlying the claim "at the time the suit was instituted").  "Courts will properly deny a motion to amend when it appears that the [movant] is using Rule 15 to make the [claims] 'a moving target . . . .'"  *Minter*, 451 F.3d at 1206 (quoting *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 800 (10th Cir. 1998)).  The requirement for good cause is "arguably more stringent" than that for undue delay under Rule 15(a), but a "rough similarity" exists between the two.  *Bylin*, 568 F.3d at 1231; *see also Minter*, 451 F.3d at 1205 n.4 (10th Cir. 2006).

This case is now over a year and two months old.  (*See* Doc. 1 (filed June 4, 2015).)  The scheduling order required Mr. Elmore to seek leave to amend pursuant to Rule 15(a)(1) by October 19, 2015.  (Doc. 40, at 2.)  Mr. Elmore did not seek leave to file an amended counterclaim until May 13, 2016, over eleven months after Harvard's complaint.  (*See* Doc. 163-1.)  Even more significantly, Mr. Elmore sought leave to amend after the Court invested time and resources in considering Mr. Elmore's original counterclaim and ordered the dismissal of many of his claims.  (*See* Doc. 137.)  Discovery has now concluded.  (*See* Doc. 85.)  The Court has

entered numerous orders that clarify the parties' claims (*see, e.g.*, Docs. 73, 137, 165), and trial is set for December, 5, 2016 (*see* Doc. 85). To allow Mr. Elmore another shot at his failed claims would disrupt the process at this point.

Mr. Elmore seeks to explain his delay by arguing that "[t]he information Mr. Elmore relies upon in support of his amended counterclaim was not available to Mr. Elmore" before the deadline to amend the counterclaim expired. (Doc. 163 at 7.) However, this assertion is inaccurate as to at least the following additions: interpretation of the initial agreement and January 2014 letter (*see, e.g.*, *id.* ¶¶ 6, 4, 67–68, 70–71, 76, 108); Harvard's knowledge that Mr. Elmore was an art dealer (*see, e.g.*, *id.* ¶ 7); publishing standards (*see, e.g.*, *id.* ¶¶ 20–24, 28, 76); Harvard's efforts to stop Mr. Elmore from distributing his book (*see, e.g.*, *id.* ¶¶ 57–58); Harvard's possession of physical and electronic copies of Mr. Elmore's manuscript (*see, e.g.*, *id.* ¶¶ 6, 92); and Mr. Elmore's thesis prior to publication (*id.* ¶ 118). By adding these assertions, Mr. Elmore seeks to bolster dismissed claims for breach of contract, breach of good faith, conversion,[4] tortious interference with prospective contractual relations, prima facie tort, and unjust enrichment. (*See id.* ¶¶ 67–68, 70–71, 76, 86, 92, 94, 108, 118.) Mr. Elmore's only explanation for delay is Harvard's alleged discovery violations (*see* Doc. 163 at 8), and he fails to justify the tardiness of a large portion of his claims. Instead, Mr. Elmore appears to be making his counterclaims "a moving target" for both Harvard and the Court. *Minter*, 451 F.3d at 1206. As such, his motion for leave to amend as it relates to these amendments is unduly delayed and should be denied.

_____

[4] Mr. Elmore appropriately notes that the Court dismissed part of Mr. Elmore's conversion claim without prejudice. (Doc. 162, at 15; *see also* Doc. 137, at 15.) In the order's conclusion, the Court incorrectly described its decision, stating that Mr. Elmore's contract—rather than conversion—claims were dismissed without prejudice. (Doc. 137, at 20, 21.) The Court hereby corrects this error.

16

**B. Futility**

Amendment is futile if the pleading "would be subject to dismissal." *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999).  Pleadings are "subject to dismissal" if they would not survive a motion to dismiss or, at least in certain cases, summary judgment. *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 561–62 (10th Cir. 1997).  ("A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment.").

A counterclaim must be dismissed if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, the claimant must "nudge [his] claims across the line from conceivable to plausible . . . ."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To evaluate the claim, courts must take all factual allegations made by the claimant as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *See Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Additionally, a counterclaim fails if the scope of the allegations "are so general that they encompass a wide swath of conduct, much of it innocent . . . .'"  *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could influence the determination of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disagreement is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  To apply this standard, courts "examine the record and all reasonable inferences that might be drawn from it in

the light most favorable to the non-moving party." *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009). In *Bauchman*, the court upheld denial to amend on futility grounds where the district court deferred its ruling until discovery was complete, the movant supplemented her motion with evidence supporting the amended complaint, and the district court determined that the evidence established undisputed facts that would make the claim "subject to dismissal on a motion for summary judgment." *Id.* at 558, 561–62.

Mr. Elmore's proposed amended counterclaim is futile because it would not survive a motion to dismiss for failure to state a claim upon which relief may be granted or, in one case, his assertion adds no substance to an existing counterclaim. Additionally, some of Mr. Elmore's claims would fail on summary judgment based on undisputed facts from evidence proffered by Mr. Elmore. This alternate holding is appropriate as discovery has now concluded and Mr. Elmore included evidence supporting his amended counterclaim in both his motion to reconsider and his reply to his motion for leave to amend. (*See* Docs. 85; 162; 185.) *See Bauchman*, 132 F.3d at 561–62.

### i.    Breach of Contract

The language in a contract is conclusive as long as it is not ambiguous. *Rivera v. Am. Gen. Fin. Servs., Inc.*, 259 P.3d 803, 812 (N.M. 2011). In determining whether the language in a contract is ambiguous, courts may consider "extrinsic evidence" to assess whether the language is "reasonably and fairly susceptible of different constructions." *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993). Even so, "[t]he question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court." *Id.*

Most of Mr. Elmore's requested amendments regarding his contract claims were known or knowable when Mr. Elmore first filed his counterclaim, and thus fail based on undue delay.

(*See* Doc. 163-1 ¶¶ 6, 4, 67–68, 70–71, 76, 108 (involving contract interpretation); *id.* ¶ 7 (Harvard's knowledge that Mr. Elmore was an art dealer); ¶¶ 20–24, 28, 76 (involving publishing standards and Ms. O'Donnell's alleged failure to conform to them).) Still, the record does not indicate whether Mr. Elmore was aware that his manuscript did not receive a second peer review until he received internal communications through the discovery process. Thus, the Court will evaluate Mr. Elmore's amended contract claims involving Harvard's alleged obligation to conduct a second peer review process. (*See id.* ¶ 67.)

Such an amendment would be futile for two reasons. First, the only reference to peer review is the Museum's agreement to pay Mr. Elmore a certain amount "upon completion and acceptance of the manuscript following peer review." (Doc. 22-1, at 2.) The agreement does not require, or even contemplate, two peer reviews. Just as importantly, the agreement does not require that the decision to accept the manuscript for publication would be based solely on the outcome of the peer review, but only that the decision would follow peer review. Second, as previously determined, "Harvard could refuse to publish the manuscript if Mr. Elmore failed to submit the manuscript by March 31, 2012." (Doc. 137, at 8.) If Mr. Elmore did not meet that deadline, the contract indicated that the agreement "may be extended by mutual written agreement of the two parties." (Doc. 22-1, at 2.) Mr. Elmore did not submit his manuscript by March 31, 2012, and the parties did not extend their agreement in writing. (Doc. 163-1 ¶¶ 11, 26–27.) As Mr. Elmore failed to meet this requirement, Harvard had the right to refuse publication absent any peer review, let alone a second peer review. Consequently, amendment to Mr. Elmore's contract claim would be futile.

### ii. Breach of Covenant of Good Faith and Fair Dealing

"The implied covenant of good faith and fair dealing protects the reasonable expectations of the parties to a contract arising from it terms." *Sanders v. FedEx Ground Package Sys., Inc.*,

188 P.3d 1200, 1202 (N.M. 2008).  As such, this covenant "cannot be used to overcome or negate an express term contained within a contract."  *Id.*

Mr. Elmore seeks to add a great number of new facts gleaned from discovery to his counterclaim.  Notably, facts related to publishing industry standards and Ms. O'Donnell's unavailability and inconsistency (*see* Doc. 163-1 ¶¶ 20–24, 28, 76) were knowable by Mr. Elmore before he filed his original counterclaim and thus fail for undue delay.  Still, Mr. Elmore relies on evidence from discovery to support claims that Harvard violated the implied covenant of good faith and fair dealing by (1) failing to conduct a second peer review, (*id.* ¶ 76 (e)); (2) failing to inform Mr. Elmore in December 2010 that Harvard decided to reject the manuscript and instead convincing Mr. Elmore to write another draft (*id.* ¶ 76(c), (d)); and (3) contracting with Dr. McChesney or another author to publish another manuscript using Mr. Elmore's research and conclusions (*id.* ¶ 76 (h), (i)).

As with his breach of contract claim, Mr. Elmore seeks to add a breach of good faith and fair dealing claim for Harvard's failure "to submit the second manuscript draft for peer review." (Doc. 163-1 ¶ 76(e).)  As already determined, the contract did not require Harvard to conduct a second peer review process.  *See supra* Section IV(B)(i).  Similarly, no such obligation arises out of the terms of the contract.  *See Sanders*, 188 P.3d at 1202.  First, Mr. Elmore could not reasonably believe that the contract's provision for "$1,000.00 upon completion and acceptance of the manuscript following peer review" (Doc. 22-1, at 2) would require Harvard to conduct two peer reviews.  Second, Mr. Elmore could not reasonably believe that the Letter of Agreement governed the arrangement when Mr. Elmore submitted his first draft after the deadline provided. (*Compare* Docs. 22-1, at 1 (providing a deadline of March 31, 2012) *with* 163-1 ¶ 11 (noting Mr. Elmore submitted his first draft May 10, 2012).)  As such, Mr. Elmore's proposed amendment

would be futile because it would fail to state a claim upon which relief could be granted.  *See* Fed. R. Civ. P. 12(b)(6).

Mr. Elmore also asserts that Harvard breached the covenant of good faith and fair dealing by "[f]ailing to advise Mr. Elmore that the manuscript would not be published when the decision to decline publication was made in December 2010[,]" instead "[c]onvincing Mr. Elmore to engage in a complete re-write of the manuscript when Harvard had no intention of publishing the manuscript . . . ."  (Doc. 163-1 ¶ 76(c), (d).)  This claim is futile, because it would fail in summary judgment.  *See Bauchman*, 132 F.3d at 562.  Mr. Elmore alleges that "[c]orrespondence between [Ms.] O'Donnell and the peer reviewer who recommended rejection of the manuscript in December 2010 show that the peer reviewer was personally familiar with Mr. Elmore, and criticized Mr. Elmore personally and professionally . . . but not for the scholarly quality of his manuscript."  (Doc. 163-1 ¶ 14.)  Yet, Mr. Elmore did not submit his first draft manuscript until May 2012.  (*See id.* ¶ 11.)  Throughout the various court submissions, Mr. Elmore has presented no evidence that a peer reviewer recommended rejection of a manuscript a year and a half before any such manuscript was written.

Mr. Elmore has, however, presented evidence that such a communication occurred on December 10, 2012.  (*See* Doc. 162-2, at 2.)  In a communication on December 10, 2012, Ms. O'Donnell told the negative peer reviewer that she needed arguments to convince the Board to reject Mr. Elmore's first draft manuscript.  (*Id.* at 2; *c.f.* Doc. 163-1 ¶ 17.)  She thanked the negative reviewer for his comments and expressed concern that other peer reviewers would not be so candid.  (Doc. 163-1 ¶ 18.)  According to Mr. Elmore, Ms. O'Donnell decided to influence the Board to decline publication at that point.  (Doc. 163-1 ¶ 25.)

If Mr. Elmore intended to assert that Harvard decided to decline publication in December 2012, Mr. Elmore's amended counterclaim would fail to state a claim upon which relief may be granted. The alleged facts, when considered with other facts alleged in Mr. Elmore's amended counterclaim, do not support Mr. Elmore's conclusion that Harvard decided not to publish the manuscript immediately after it received the first draft. (*See id.* ¶ 76(c), (d).) Mr. Elmore's assertions that Ms. O'Donnell decided to influence the Board to reject Mr. Elmore's manuscript (Doc. 163-1 ¶ 25), do not support a conclusion that the Board decided to reject the manuscript at that point. Even if Ms. O'Donnell no longer supported publishing the manuscript after she reviewed Mr. Elmore's first draft, the Board did not empower Ms. O'Donnell to reject the manuscript after Mr. Elmore submitted his second draft in November 2013. (*Id.* ¶ 27.) These facts do not suggest that the Board decided to reject Mr. Elmore's manuscript in December 2012, but rather in November 2013, when it empowered Ms. O'Donnell to reject the manuscript. At a minimum, the facts alleged "encompass a wide swath of conduct, much of it innocent[,]" and thus the amended counterclaim would still fail to state a claim upon which relief may be granted. *Robbins*, 519 F.3d at 1247.

Additionally, this claim would fail on summary judgment. To support his assertion that his amended counterclaim was based on new evidence from discovery, Mr. Elmore submitted evidence regarding this claim. (Doc. 181.) This evidence shows that, after the peer review, board members, including the director of the Museum, were still enthusiastic about the project. (Doc. 181-2, at 1.) Consequently, the Board decided "to give Steve a chance to respond to the review's criticisms in a revised manuscript." (*Id.*) Board minutes from the November 2013 Board meeting show that the Board entrusted the final decision to reject the manuscript to Ms. O'Donnell and the director of the Museum (Doc. 181-1, at 2), and only then did they decide to

reject the manuscript (*see* Doc. 181-2 (communication between the two stating "you're right that it just isn't up to Peabody standards of scholarship").)  Mr. Elmore has not challenged this evidence that the Board did not decide to reject Mr. Elmore's manuscript in 2012.  As such, Mr. Elmore's proposed amendment is futile because it would fail on summary judgment.

Lastly, Mr. Elmore claims Harvard breached the covenant of good faith and fair dealing by contracting with Dr. McChesney or another author to publish a manuscript using Mr. Elmore's research.  (Doc. 163-1 ¶ 76(h), (i).)  These claims are duplicative of claims that survived Harvard's original motion to dismiss.  (*See* Doc. 137, at 20 ("Mr. Elmore's claim for breach of good faith and fair dealing survives regarding Mr. Elmore's allegation that Harvard convinced him to rewrite his manuscript so Harvard could use his methodology and research for a contract with a different author.").)  As such, no amendment to Mr. Elmore's counterclaim is necessary in this case.

### iii.    *Tortious Interference with Prospective Contractual Relations*

To state a claim for tortious interference with prospective contractual relations, the claimant must allege that the defendant acted either with an improper motive solely to harm the claimant or an improper means to interfere with the contractual relations.  *M & M Rental Tools, Inc. v. Milchem, Inc.*, 612 P.2d 241, 245 (N.M. Ct. App. 1980).  Improper means include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood."  *Fikes v. Furst*, 81 P.3d 545, 553 (N.M. 2003) (quoting *M & M Rental Tools*, 612 P.2d at 246).

In his amended claim, Mr. Elmore asserts Harvard interfered with Mr. Elmore's prospective contractual relations involving a documentary film when "Harvard withdrew its support of Mr. Elmore based on [Ms.] O'Donnell's unilateral decision that Mr. Elmore's book was not academic research."  (Doc. 163-1 ¶ 86.)  According to Mr. Elmore, Ms. O'Donnell

interfered by advising the director of the Museum to be wary of Mr. Elmore because he was a Native American art dealer.  (*Id.* ¶ 64.)

This communication does not give rise to a plausible claim that Ms. O'Donnell acted with an improper motive solely to harm Mr. Elmore.  Mr. Elmore acknowledges that Ms. O'Donnell decided Mr. Elmore's book "was not academic research."  (Doc. 163-1 ¶ 86.)  As the director of the Peabody Museum Press, Ms. O'Donnell would have many proper reasons to advise the director of the Peabody Museum against supporting a project she did not believe was based on "academic research."  (*Id.*)  As such, Mr. Elmore fails to state a plausible claim that, instead, Ms. O'Donnell acted solely to harm Mr. Elmore.  *See M & M Rental Tools*, 612 P.2d at 245.

Additionally, Mr. Elmore's claim that Ms. O'Donnell acted with an improper motive solely to harm him would fail on summary judgment.  Based on evidence submitted by Mr. Elmore, the director of the Museum received an e-mail from Mr. Elmore asking if Harvard would "be interested in" sponsoring a film project on Nampeyo.  (Doc. 162-3, at 2.)  The director of the Museum asked Ms. O'Donnell "what [she] ma[de]" of Mr. Elmore's proposal.  (*Id.* at 1.)  Ms. O'Donnell responded that she had received two of three reviews of Mr. Elmore's manuscript and both "sen[t] up red flags."  (*Id.*)  After providing examples of the reviewer's comments, she stated "Steve is a primary dealer in Nampeyo's work, and both the book and film serve to enhance his professional reputation and increase his business.  Both reviewers are correct in their opinion that the Peabody should be wary.  I'm afraid this is not disinterested scientific research."  (*Id.*)  These undisputed facts do not show that Ms. O'Donnell's sole motive was to harm Mr. Elmore, but rather that she sought to respond candidly to her colleague.  As such, his proposed amended counterclaim would fail on summary judgment.

As for improper means, Mr. Elmore does not assert that Ms. O'Donnell used violence, threats, intimidation, bribery, or unfounded litigation to warn the director of the Museum.  *See Fikes*, 81 P.3d at 553.  Moreover, Ms. O'Donnell's assertions were not deceit, defamation, or disparaging falsehood, as Mr. Elmore admits he "has been in the business of buying and selling Native American art . . . ."  (Docs. 22 ¶ 4; 163-1 ¶ 4.)  Taking Mr. Elmore's assertions as true, he does not state a plausible claim that Ms. O'Donnell used improper means to interfere with the potential film project when she expressed concerns that Mr. Elmore had not conducted "academic research" in light of his profession.  (Doc. 163-1 ¶ 4.)  Similarly, undisputed facts fail to create a genuine issue regarding Harvard's means of interfering with Mr. Elmore's prospective film contract, which would be necessary to survive summary judgment.

       *iv.*     *Misappropriation of Intellectual Property*

New Mexico courts do not appear to have considered claims for misappropriation of intellectual property.  (*See* Doc. 137, at 16.)  In Texas, misappropriation of intellectual property requires that "(1) the idea is novel; (2) disclosure of the idea was made in confidence; and (3) the idea was adopted and made use of by the defendant."  *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir. 1984).

Mr. Elmore seeks to amend his complaint to assert that, although he submitted his manuscripts "in confidence[,]" Dr. McChesney and other "individuals outside of the external review process . . . have shown intimate knowledge of the facts, reasoning, and analysis offered by Mr. Elmore to support his thesis before *In Search of Nampeyo* was published."  (Doc. 163-1 ¶ 101.)  Mr. Elmore further asserts "[a]s detailed above [describing knowledge of individuals outside the review process], Harvard has used and adopted Mr. Elmore's ideas by attributing multiple pieces of pottery to Nampeyo using Mr. Elmore's methodology and thesis."  (*Id.* ¶ 102.)  As in the original counterclaims, his assertions regarding Dr. McChesney or other unnamed

individuals do not state a claim for misappropriation of intellectual property.   Neither the negotiations with Dr. McChesney nor others' knowledge regarding Mr. Elmore's facts, reasoning, and analysis indicate that Harvard adopted Mr. Elmore's ideas.   In fact, the negotiations indicate Harvard continued to credit Mr. Elmore with those ideas, as it sought to coordinate a joint publication between Dr. McChesney and Mr. Elmore.   (*Id.* ¶ 48.)   As such, these facts do not state a plausible claim upon which relief may be granted.

Additionally, such claims would fail on summary judgment.   Beyond his claim regarding contracts with other authors, Mr. Elmore offered four other pieces of evidence to support his claim that Harvard has used Mr. Elmore's ideas by attributing pottery to Nampeyo.   First, is an internal e-mail between Harvard employees that states "Stephen LeBlanc and I think we might have another early Nampeyo . . . . We have re-labeled it a reproduction after re-reading Stephen's catalog of the Keam collection."   (Doc. 162-4.)   This fails to show that Harvard adopted Mr. Elmore's thesis because Stephen LeBlanc and another Harvard employee, not Steve Elmore,[5] identified the piece of pottery.   (*Id.*)   Additionally, Harvard has not used Mr. Elmore's thesis to attribute pottery because employees only "think" the pottery "might" be Nampeyo.   *See Apple Barrel Prods.*, 730 F.2d at 389.   For the next piece of evidence, Mr. Elmore provides an internal Harvard e-mail stating that a Harvard employee "just found a bowl" with polish that "looks Nampeyo, [and] sort of supports [Mr. Elmore's] ideas."   (Doc. 162-6.)   Like the first example, Harvard did not adopt Mr. Elmore's idea involving Nampeyo in general and certainly not regarding this pot specifically.   Instead, the employee identified the pottery himself and merely notes that it "sort of supports" Mr. Elmore's claim.   Additionally, Harvard did not use Mr. Elmore's idea.   There is no evidence that the employees took any action regarding this

---

[5] Notably, the e-mail refers to Mr. Elmore as "Steve" earlier in the e-mail.  (Doc. 162-4.)

artifact based on Mr. Elmore's theory. As such, these internal communications fail to create a genuine issue of fact.

The last two examples involve statements made after Mr. Elmore published his book. Mr. Elmore provides an e-mail exchange between a Museum patron and a Harvard employee. (Doc. 185-2.) The patron contacted the Museum, expressing interest in "research by Steve Elmore that lead to the discovery of [Nampeyo's] pottery collection at the [Museum]" and asked to see the "extraordinary collection." (*Id.* at 2.) In response, the Harvard employee stated "[t]he Keam collection itself is quite large, but I will be able to point out a few vessels that are attributed to Nampeyo during the tour." (*Id.* at 1.) The conversation occurred after Mr. Elmore published his book and the idea was no longer secret. *C.f. Apple Barrel Prods.*, 730 F.2d at 389 (requiring that the idea be disclosed in confidence). More importantly, Harvard did not adopt Mr. Elmore's thesis, but rather stated, as true, that the pottery was "attributed to Nampeyo . . . ." (Doc. 185-2 at 1.) *See Apple Barrel Prods.*, 730 F.2d at 389.

The final example demonstrates Mr. Elmore's attempt to grasp at every straw to argue this point. During the preliminary hearing, Mr. Elmore's counsel asked a Harvard employee, "[d]o you know who the artist [of certain artifacts depicted in *Historic Hopi Ceramics*] is?" (Doc. 88, at 82:1–5; *see also* Pl.'s Prelim. Inj. Ex. 22, at 2 (showing, on the left hand side, the artifacts in question).) The employee answered, "I do not know specifically, but I assume it was Nampeyo . . . . Because it's a book about Nampeyo." (Doc. 88, at 82:4–7.) Then, she clarified, "I'm sorry. I'm looking at the wrong one. I don't know who particularly created those" artifacts. (*Id.* at 82:10–12.) A reasonable juror could not determine, based on this evidence that Harvard adopted Mr. Elmore's thesis and made use of it. *See Apple Barrel Prods.*, 730 F.2d at 389. The employee never stated the artifacts were made by Nampeyo, but rather based her

assumption on the fact that the book was "about Nampeyo."  (Doc. 88, at 82:4–7.)  She also never "made use of" Mr. Elmore's thesis, but instead sought to answer a question under oath truthfully.  *Id.*  Thus, this claim would fail on summary judgment.

In sum, all of Mr. Elmore's requested amendments (Doc. 163-1) are either unduly delayed or futile.  As such, the Court will deny Mr. Elmore's motion for leave to amend.

## V.   MR. ELMORE'S MOTION TO RECONSIDER

"The Federal Rules of Civil Procedure do not recognize a 'motion to reconsider.'"  *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991).  When a movant requests such relief, courts construe the motion as "either a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e)" within 28 days of final judgment "or a motion seeking relief from the judgment pursuant to Fed. R. Civ. P. 60(b)" after 28 days have passed.  *Id.*; *see also Ysais v. Richardson*, 603 F.3d 1175, 1178 n.3 (10th Cir. 2010) (noting Rule 59 was amended effective December 1, 2009 "to provide that a motion to alter or amend a judgment may be filed within 28 days[,]" instead of the original ten days, after judgment).

A motion to reconsider pursuant to Rule 59(e) "should be granted only 'to correct manifest errors of law or to present newly discovered evidence.'"  *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997) (quoting *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1523 (10th Cir. 1992)).  As such, a motion for reconsideration "is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing."  *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

As discussed above, the newly discovered evidence regarding Mr. Elmore's counterclaims would not have altered the analysis for dismissal pursuant to Rule 12(b)(6).  The one exception, based on Mr. Elmore's assertion that Harvard decided to reject the manuscript in

December 2010 (*see* Doc. 163-1 ¶ 76 (c)), is unavailing.  Mr. Elmore's exhibit to support this new evidence indicates that Ms. O'Donnell's alleged decision to reject the manuscript occurred in December 2012, which alters the analysis.  *See supra* Section IV(B)(ii).  Thus, Mr. Elmore's assertion of newly discovered evidence does not support his request for reconsideration.

Mr. Elmore requests that, at a minimum, the Court revise its ruling by denying all Mr. Elmore's counterclaims without prejudice.  (*See* Doc. 162, at 14.)  Citing *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006), Mr. Elmore asserts "a dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."  Yet *Brereton* involved a Rule 12(b)(6) motion based on jurisdiction and a request for leave to amend.  *See Brereton*, 434 F.3d at 1219 ("A denial of leave to amend *to repair a jurisdictional defect*, even on futility grounds, does not call for a dismissal with prejudice.") (emphasis added).  "[N]ormally a court need not grant leave to amend when a party fails to file a formal motion" prior to dismissal.  *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999).  *See also In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1118–19 (10th Cir. 2015).  Technically, claimants are required to file a separate motion for leave to amend, but at minimum, courts require a request for leave to amend and particular grounds for the request.  *Calderon*, 181 F.3d at 1186.  This requirement provides notice as to the rationale for requested leave, reduces prejudice to either party, and assures that "the court can comprehend the basis of the motion and deal with it fairly."  *Id.* (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1192 at 42 (2d ed. 1990)).  Thus, a district court does not abuse its discretion by dismissing a complaint with prejudice where the claimant hastily requests leave to amend in a response to the motion to dismiss.  *Id.*

Here, Mr. Elmore failed to request leave to amend in any way until twenty-one days after the Court ruled on the motion to dismiss.  (*See* Docs. 137, 162.)  To fully consider Mr. Elmore's amended counterclaim after the Court's detailed assessment of the original claims would prejudice Harvard.  As such, the Court will not revise its order by dismissing claims without prejudice.

## VI.    CONCLUSION

The amended counterclaim alleged in Mr. Elmore's Answer to Amended Complaint for Injunction and Damages and Counterclaim is untimely pursuant to 15(a)(3) and Mr. Elmore did not request leave to amend this version of his counterclaim.  Mr. Elmore requested leave to amend another version of his counterclaim, but the request was unduly delayed and it would be futile to allow amendment to assert the alleged facts unavailable prior to discovery.  Mr. Elmore's motion to reconsider does not plead newly discovered facts that would change the analysis.  Lastly, based on the Court's decision, Harvard's motion to strike Mr. Elmore's reply is denied as moot.

**THEREFORE**,

**IT IS ORDERED** that Plaintiff's Partial Motion to Dismiss Defendant's Counterclaims (Doc. 196) is **GRANTED**; Defendant Steve Elmore's Motion for Leave to Amend Counterclaim (Doc. 163) is **DENIED**; Defendant Steve Elmore's Motion to Reconsider (Doc. 162) is **DENIED**; and Plaintiff's Motion to Strike Defendant Steve Elmore's Consolidated Reply in Support of Motion to Reconsider and Motion for Leave to Amend Counterclaim (Doc. 195) is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**