IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,

      Plaintiff,

v.                                                No. CIV 15-00472 RB/KK

STEVE ELMORE, STEVE ELMORE
PHOTOGRAPHY, INC., d/b/a STEVE ELMORE
INDIAN ART, and d/b/a SPIRIT BIRD PRESS,

      Defendants.

SEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on Plaintiff's Motion for Summary Judgment Dismissing Defendant's Remaining Counterclaims (Doc. 209) and Plaintiff's Motion for Summary Judgment on Defendant's Damage Claims (Doc. 211). Plaintiff President and Fellows of Harvard College (Harvard) initiated suit against Steve Elmore and Steve Elmore Photography, Inc. (collectively, Mr. Elmore) for publishing a book that allegedly infringed on Harvard's copyrights, falsely designated the origin of certain illustrations, and published photographs in breach of a contract with Harvard. (Docs. 1; 17.) Mr. Elmore filed counterclaims, many of which the Court dismissed. (Docs. 137; 266.) Harvard now seeks summary judgment on Mr. Elmore's remaining counterclaims and, specifically, his claim for punitive damages. (Docs. 209; 211.) Having reviewed the parties' submissions and arguments, the Court **GRANTS in part and DENIES in part** Plaintiff's Motion for Summary Judgment Dismissing Defendant's

---

[1] This memorandum opinion and order is sealed, as it discusses the contents of documents that are sealed. (*See* Docs. 181-1; 181-2.) If the parties would like to have the opinion unsealed, either may file an unopposed motion with the Court.

Remaining Counterclaims (Doc. 209) and **GRANTS** Plaintiff's Motion for Summary Judgment

on Defendant's Damage Claims (Doc. 211).

## I.      FACTS IN THE LIGHT MOST FAVORABLE TO MR. ELMORE

The facts of this case are well developed in other orders (*See, e.g.*, Docs. 75, 137; 165),

but the Court presents them briefly according to the summary judgment standard and as relevant

to Mr. Elmore's remaining counterclaims.

In August 2010, Mr. Elmore and Harvard entered into a contract, the Letter of

Agreement.  (Doc. 22-1.)  This letter "memorialize[d] the agreement between [Harvard], on

behalf of the Peabody Museum of Archaeology and Ethnology [the Museum] and Mr. Steve

Elmore to produce for the Peabody Museum Press [the Press] a book . . . ."  (*Id.* at 1.)  The book,

"provisionally titled 'In Search of Nampeyo: The Apprenticeship of a Great Hopi Artist,'" was to

discuss "Nampeyo pottery in the [Museum's] Keam collection.  (*Id.*)

Mr. Elmore agreed to "write and deliver to [the Press] . . . a complete manuscript ( . . .

including front matter, text, bibliographic references, copies of illustrations, and figure captions)

. . . ."  (Doc. 22-1, at 1.)  Mr. Elmore agreed to "work in consultation with the Museum and the

Press to select objects from the collection for illustration in the volume[,]" and the Museum was

to "handle all photography and produce any other needed artwork for the volume."  (*Id.*)

Conversely, Mr. Elmore was responsible for "obtain[ing] any necessary permissions for the use

of material owned by others" and agreed to "submit copies of all permissions, as well as credit

lines covering the materials, to the Press."  (*Id.*)  The Press agreed to "manage editorial, design,

and production work for the volume . . . ."  (*Id.*)  The parties agreed the manuscript would be a

"Work Made for Hire as such term is used and defined in the United States Copyright Act."  (*Id.*)

As such, Mr. Elmore agreed "to grant, assign, and transfer to [Harvard] all publication rights to

the manuscript and book, including all rights of copyright." (*Id.*) The Museum agreed to pay Mr. Elmore a sum upon completion and acceptance of the manuscript and also agreed "to provide Mr. Elmore with up to $1,500.00 in expense reimbursement for a research visit to the Museum." (*Id.*)

In furtherance of this agreement, Mr. Elmore contacted the director of the Press, Joan Kathryn O'Donnell, regarding a trip to the Museum to research the Keam Collection and take photographs. (Doc. 7 ¶ 5; *id.* at 9–10; Doc. 88, at 177:5–9.) Mr. Elmore asked Ms. O'Donnell if he could "speak with the photographer" about arranging the pottery for photographs for the book during his visit. (Doc. 7, at 10.) Ms. O'Donnell explained that the Museum wouldn't "do photography for the book until the manuscript is delivered and accepted . . . ." (*Id.* at 9.) Ms. O'Donnell suggested Mr. Elmore check with the curatorial associate for the Museum, Susan Haskell, about "taking record shots . . . , which could be useful [for] work[ing] with the studio photographer." (*Id.* at 9; Pl.'s Prelim. Inj. Exs. 6; 12.) Ms. O'Donnell also stated "I have no idea what the Collections people allow in terms of making record shots, so you'll have to take it up with them." (Doc. 7, at 9.)

About a month before Mr. Elmore's visit, Ms. Haskell sent Mr. Elmore a form entitled "Permission to Photograph Collections" (Photography Agreement). (Pl.'s Prelim. Inj. Ex. 12; Doc. 180 ¶ 4.) By signing the Photography Agreement, Mr. Elmore agreed not to "publically exhibit[]" any photographs he took at the Museum, absent enumerated exceptions, "without prior written permission of the Museum . . . ." (Doc. 1-1.) Mr. Elmore signed the Photography Agreement about two weeks before visiting the Museum. (Docs. 1-1; 7, at 9.)

Mr. Elmore used his American Express miles to pay for three round trip flights from Albuquerque, New Mexico, to Boston, Massachusetts. (Doc. 209-4, at 51:22–24.) He brought

with him Linda Weiner, his partner, to help with note taking and "Rachel Sahmie, . . . the great-great-granddaughter of Nampeyo and a very established master Hopi potter." (Docs. 7, at 9; 88, at 148:18, 178:16–18.)  During the visit, Mr. Elmore selected and arranged the pottery "to reveal information about" the pieces and took pictures of the pottery. (*See* Doc. 88, at 178:23–25.)  Mr. Elmore included these photographs in both versions of the manuscript he submitted to the Press. (*See* Doc. 13-1 ¶ 16; *see, e.g.*, Def.'s Prelim. Inj. Exs. F, at 105; G, at 83–94.)  In total, Mr. Elmore spent more than $2,000 on the research trip. (Doc. 209-4, at 51:1–3.)  Mr. Elmore was reimbursed for $1,243, based on receipts he submitted to Harvard. (*Id.*)  Ms. O'Donnell later told Mr. Elmore it was too late to submit any additional receipts. (*Id.*)

Mr. Elmore submitted his first version of the manuscript to Harvard on May 10, 2012. (Doc. 13-1 ¶ 14.)  Three anonymous academic readers reviewed the manuscript. (Doc. 89-2, at 5.)  One reviewer recommended accepting the manuscript without revisions, the second reviewer recommended accepting it with revisions, and the third reviewer recommended rejecting it. (Doc. 13-1 ¶ 15.)  In December 2012, the peer reviewer who suggested rejecting the manuscript submitted a detailed review to Ms. O'Donnell. (Doc. 89-8.)  The peer reviewer asked Ms. O'Donnell if she was having difficulty finding the words "with which to reject" the manuscript. (Doc. 89-8, at 3.)  Ms. O'Donnell responded that she was not so much uncomfortable about rejecting it, but rather needed "to present strong and explicit arguments to [her] editorial board and the museum brass." (*Id.* at 2.)  She thanked the reviewer for being candid and expressed concern that the other peer reviewers would be less candid. (*Id.*)

The Press's Editorial Advisory Board (the Board) evaluated the peer reviews and decided the manuscript could not be published without revision. (Doc. 7 ¶ 4.)  Still, "there was some real enthusiasm for the project among board members." (Doc. 181-2, at 1.)  Mr. Elmore understood

4

the process as a recommendation that he "rewrite the manuscript as a full academic paper for Harvard[,]" with a promise that Harvard would provide him a second contract. (Doc. 13-1 ¶ 15.) Ms. O'Donnell instructed Mr. Elmore to "write lengthy responses to the questions and criticisms of the three anonymous reviewers." (*Id.*) Meanwhile, Ms. O'Donnell sent an e-mail to the museum director, stating that "the Peabody should be wary[,]" of working with Mr. Elmore, as the book would "serve to enhance his professional reputation and increase his business . . . ." (Doc. 162-3, at 1.)

In November 2013, Mr. Elmore submitted a second version of the manuscript. (Doc. 13-1 ¶ 16.) This version was 94 pages longer than the original draft. (*Compare* Def.'s Prelim. Inj. Ex. F (148 pages) *with* Def.'s Prelim. Inj. Ex. G (242 pages).) In December 2013, the Board reviewed the second version of the manuscript. (Doc. 181-1.) Board members criticized the scholarship and Mr. Elmore's method of attributing the pottery to Nampeyo. (*Id.* at 2.) They noted that the Press's "[p]aper series would be appropriate if [the] scholarly argument was strong; however, [Mr. Elmore] has not met the standard." (*Id.*) Board members also discussed an article in *American Indian Art Magazine*, which they described as "an early rebuttal to [Mr.] Elmore's study" and cited as evidence that Mr. Elmore "is controversial and polarizing in [the] Indian arts community." (*Id.*) Ultimately, the Board reached a consensus to "reject the project[,]" subject to a final review by Ms. O'Donnell and the director of the Museum. (*Id.*) The Board further agreed not to obstruct Mr. Elmore's use of the Museum's images. (*Id.*; *see also* Doc. 181-2, at 1.)

Ms. O'Donnell informed Mr. Elmore of the Press's decision not to publish the work by hand delivering a letter, dated January 21, 2014. (Doc. 13-1, at 10.) The letter provided "formal notification that the" Museum returned to Mr. Elmore "all rights in the manuscript . . . , including

all versions of the manuscript submitted to [the Press]." (*Id.*)  The Board recommended that Mr. Elmore "find a magazine or trade publisher that specializes in Southwest Indian art to publish the work." (*Id.*)  The Museum offered to provide Mr. Elmore, "without charge, 10 to 15 high-quality, existing [Museum] photographs to use in such publication." (*Id.*)  In the letter, Ms. O'Donnell did not specify whether the Museum's offer of Peabody photographs was in addition to the photographs in the manuscript or a substitute for the photographs in the manuscript. (Doc. 230-1, at 159:21–160:7.)

At the time, Ms. O'Donnell described the rejection to a colleague at the Museum as "essentially turning down the book as it stands but offering him the chance to consider revising it as a collection series book, but with the condition that he work with a co-author who can produce a [manuscript] up to [the Press's] standards." (Doc. 162-4.)  She asked that colleague, who was about to retire, to co-author the book with Mr. Elmore. (*Id.* at 1.)  Additionally, correspondence in 2015 between another author, Lea McChesney, and another Museum employee indicates that Ms. O'Donnell discussed "a joint publication [with] Elmore's work . . . ." (Doc. 223-7, at 2.) Ms. O'Donnell apparently did not follow up on that discussion. (*Id.*)  Mr. Elmore alleges that, in December 2014, Dr. McChesney visited Mr. Elmore's art gallery in Santa Fe, New Mexico, and "interrogated Mr. Elmore specifically about the information in his manuscript, prying for more information of the details of Mr. Elmore's research of Nampeyo." (Doc. 223-8, at 3.)  Mr. Elmore also alleges that Dr. McChesney "boasted about securing writing projects with Harvard and the Peabody on Nampeyo's ceramics in the Keam Collection." (*Id.*)

In 2015, Mr. Elmore published his manuscript, entitled *In Search of Nampeyo: The Early Years, 1875–1892*, through Spirit Bird Press, a subsidiary of Steve Elmore Indian Art. (Pl.'s Supp. Ex. 1.)  Mr. Elmore did not contact Harvard for any additional photographs, and instead

used photographs he took during his visit to the Museum and images based on photographs from a previous Press publication, *Historic Hopi Ceramics*.  (Doc. 88, at 153:20–154:6, 155:10–23.) Harvard asserts, through an affidavit, that Mr. Elmore used fifty images from *Historic Hopi Ceramics*.  (Doc. 6 ¶¶ 17–18.)  Mr. Elmore argues, but presents no evidence, that only forty-seven illustrations in the book were based on images from *Historic Hopi Ceramics*.  (Doc. 223, at 11 (citing to Doc. 178 ¶¶ 98–100, Mr. Elmore's counterclaim to Harvard's amended complaint).)

On June 4, 2015, Harvard filed suit against Mr. Elmore, alleging copyright infringement, breach of contract, and false designation of origin.  (Doc. 1.)  On June 8, 2015, Harvard's counsel sent a letter to "Amazon.com Legal Department" [Amazon].  (Doc. 178-6.)  In the letter, Harvard's counsel stated Harvard owned "copyrights to fifty photographs infringed in" Mr. Elmore's book.  (*Id.*)  The letter also stated counsel's "good faith belief that [Mr. Elmore's book] . . . is not authorized by Harvard, any of its agents or the law."  (*Id.*)  Finally, Harvard's counsel requested that Amazon "remove and cease all sales of" Mr. Elmore's book.  (*Id.*)  The parties agree Amazon ceased its sales of the book.  (Doc. 37, at 8; Doc. 223, at 11.)

A great deal has occurred since Harvard initiated suit.  Harvard requested a preliminary injunction to enjoin Mr. Elmore from further distributing his book (Doc. 5, at 25), which the Court granted in part based on Harvard's contract and false designation of origin claims (Doc. 75).  For purposes of the preliminary injunction, the Court determined that Harvard's copyright infringement claims were not likely to succeed, as the *Historic Hopi Ceramics* photographs lacked originality.  (Doc. 75, at 16.)  Mr. Elmore filed a counterclaim (Doc. 22), and the Court dismissed many of his claims (Doc. 137).  Meanwhile, Mr. Elmore sought summary judgment on Harvard's copyright claims (Doc. 92), which the Court granted (Doc. 165).  In its order, the

Court determined that the case presented "one of those rare circumstances where factual copying . . . appears clear." (*Id.* at 11.) Even so, the Court determined, as a matter of law, that the *Historic Hopi Ceramics* copyright only protected "minimal creativity in the compilation and arrangement of the artifacts . . . ." (*Id.* at 22.) Based on this determination, the Court concluded that copyright infringement did not occur because, "[c]onsidering only the protected elements in the *Historic Hopi Ceramic* photographs and Mr. Elmore's images, reasonable minds could not find substantial similarity between the two." (*Id.*) Conversely, Harvard succeeded on its motion for summary judgment on its contract claims. (Doc. 265, at 20.)

Mr. Elmore's surviving counterclaims are: (1) contract claims relating to Harvard's failure to reimburse Mr. Elmore for his travel expenses; (2) breach of good faith and fair dealing claims for convincing Mr. Elmore to rewrite his manuscript so Harvard could use it for publication with a different author; (3) tortious interference with contractual relations for causing Amazon to stop selling Mr. Elmore's book; (4) conversion claims against Harvard for defying Mr. Elmore's rights to his manuscript when Harvard caused Amazon to stop selling Mr. Elmore's book; and (5) punitive damages regarding these claims. (Doc. 137, at 20–21.) Harvard now seeks summary judgment on all of these claims (Doc. 209) and specifically on the claim for punitive damages (Doc. 211).

The Court denies Harvard's motion for summary judgment on the contract claim and grants Harvard's motion on all other claims. Mr. Elmore's testimony regarding his use of American Express miles and other travel expenses establishes a genuine issue of material fact that he incurred at least $1,500 to fly himself and two other individuals to Boston for his research trip. *See infra* Section III(A). Mr. Elmore fails to establish a genuine issue of material fact for his breach of good faith claim, as Mr. Elmore's only evidence that Harvard sought to contract

with another author to write about Mr. Elmore's thesis was as a joint publication with Mr. Elmore after Harvard rejected Mr. Elmore's manuscript. *See infra* Section III(B). Mr. Elmore's claim for tortious interference with contractual relations for causing Amazon to stop selling Mr. Elmore's book fails because Mr. Elmore has not shown a genuine issue of fact that Harvard acted with a primary motive to harm Mr. Elmore or through improper means. *See infra* Section III(C). Lastly, Mr. Elmore's claim for conversion fails on summary judgment because Mr. Elmore has not established a genuine issue of fact that he had a right to publish the photographs he took at the Museum. *See infra* Section III(D).

## II.    LEGAL STANDARD

Summary judgment on a claim pursuant to Federal Rule of Civil Procedure 56 is only appropriate if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is material if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disagreement is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To apply this standard, courts "examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009).

"[T]he movant bears the initial burden to show that no genuine issue of material fact exists." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A party may carry that burden by citing specific portions of the record or by showing that the record contains no admissible evidence to establish a genuine dispute. Fed. R. Civ. P. 56(c)(1). If the movant satisfies its initial burden, the burden shifts to the non-movant. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Then, the non-movant must identify evidence that

establishes a genuine issue on all "elements essential to [the non-movant's] case on which he bears the burden of proof at trial." *Celotex*, 477 U.S. at 322. If the non-movant fails to establish a genuine issue on any essential element, summary judgment is proper. *Id.*

The non-movant may not rely on mere allegations to establish a genuine issue of fact, but must instead set forth specific facts by affidavit or other evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[A]ffidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence . . . ." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Still, a non-movant need not "produce evidence in a *form* that would be admissible at trial, 'but the content or substance of the evidence must be admissible.'" *Treff v. Galetka*, 74 F.3d 191, 195 (10th Cir. 1996) (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)).

## III.   DISCUSSION

### A.  Breach of Contract

"When a contract is clear as written, a court 'must give effect to the contract and enforce it as written.'" *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 860 (N.M. 2013) (quoting *Ponder v. State Farm Mut. Auto. Ins. Co.*, 12 P.3d 960, 964 (N.M. 2000)). However, when a contract is silent on an issue, the court may use "evidence of custom and usage" to determine the parties' intentions. *Id.* at 860–61 (quoting 21A Am. Jur. 2d *Customs and Usages*, § 25 (2012)). Additionally, where ambiguity exists, the contract's meaning is construed against the drafter. *Smith v. Tinley*, 674 P.2d 1123, 1125 (N.M. 1984).

In this contract, the Museum agreed "to provide Mr. Elmore with up to $1,500.00 in expense reimbursement for a research visit to the Museum." (Doc. 22-1, at 2.) The contract does not clarify which expenses will be allowed or how reimbursement will be calculated. For example, the contract does not explain whether receipts will be necessary to justify expenses or if

10

American Express miles are reimbursable expenses.  (*See* Doc. 22-1.)  Mr. Elmore admits he

only submitted $1,243 in receipts for reimbursement.  (Doc. 209-4, at 51:1–3.)  Still, he asserts

he incurred more than $2,000 in expenses on the trip, in part based on his use of American

Express miles to fly three individuals to Boston.  (*Id.* at 51:1–3, 22–24.)  Neither party has

provided any evidence of custom or usage of such clauses in publishing contracts.  Still, Mr.

Elmore's assertions set forth specific facts and are based upon personal knowledge.  *See Lujan*,

504 U.S. at 561; *Hall*, 935 F.2d at 1111.  Harvard contracted to reimburse Mr. Elmore for "up to

$1,500.00 in expenses" (Doc. 22-1, at 2) and, as Harvard drafted the contract, the contract's

meaning is construed against Harvard, *Tinley*, 674 P.2d at 1125.  Mr. Elmore sufficiently

establishes a genuine issue of material fact as to his additional entitlement to $257 in

reimbursable expenses.

### B.  Breach of Implied Covenant of Good Faith and Fair Dealing

"The implied covenant of good faith and fair dealing protects the reasonable expectations

of the parties to a contract arising from its terms."  *Sanders v. FedEx Ground Package Sys., Inc.*,

188 P.3d 1200, 1202 (N.M. 2008).  This implied covenant seeks to "mak[e] effective the

agreement's promises."  *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 925 (N.M. Ct. App.

2003).  To establish a breach of this covenant in New Mexico, the plaintiff must show "bad faith

or that one party wrongfully and intentionally used the contract to the detriment of the other

party."  *Sanders*, 188 P.3d at 1203 (quoting *Cont'l Potash, Inc. v. Freeport–McMoran, Inc.*, 858

P.2d 66, 82 (N.M. 1993)).  In other words, a party breaches the covenant by "seek[ing] to

prevent the contract's performance or . . . withhold[ing] its benefits from the other party."  *Azar*,

68 P.3d at 925.

Mr. Elmore asserts that Harvard misappropriated Mr. Elmore's research "for publication in another book concerning the same subject matter and content of" Mr. Elmore's manuscript. (Doc. 22 ¶ 42(e); *see also id.* at (d).)  The evidence, however, does not support this claim.  Most of the evidence Mr. Elmore seeks to include merely establishes that Harvard sought to salvage the project after it rejected Mr. Elmore's second draft by pairing Mr. Elmore with a second author.  (*See* Doc. 162-4 (describing, in 2014, rejection of Mr. Elmore's manuscript with a chance for Mr. Elmore to revise his manuscript with a co-author and asking a colleague to be that co-author); Doc. 223-7, at 2 (discussing, in 2015, a potential joint publication regarding Mr. Elmore's work, which Ms. O'Donnell never followed up on).)  Such attempts on Harvard's part would not prevent performance of the Letter of Agreement or withhold benefits from Mr. Elmore, as Harvard only sought such contracts after it reviewed Mr. Elmore's manuscript for publication and denied it.  *See Azar*, 68 P.3d at 925.  If anything, these efforts sought to provide Mr. Elmore with benefits he failed to obtain pursuant to the contract: acceptance for publication following peer review.  (*See* Doc. 22-1, at 2.)

Arguably, the one piece of evidence that may support Mr. Elmore's claim is his testimony that Dr. McChesney interrogated him "specifically about the information in his manuscript" and "boasted about securing writing projects with [the Museum] on Nampeyo's ceramics in the Keam Collection."  (Doc. 223-8, at 3.)  The evidence that Dr. McChesney had secured writing projects with the Museum on Nampeyo, however, is inadmissible hearsay. Hearsay is an out of court statement offered to show the truth of the matter asserted.  Fed. R. Evid. 801(c).  Dr. McChesney was out of court when she "boasted" about her writing projects, and Mr. Elmore offers her statement to show that she had contracts for writing projects with Harvard.  (*See* Doc. 223, at 9.)  Dr. McChesney's comment would not be admissible at trial, and

"the content or substance of the evidence must be admissible" at trial to survive summary judgment. *Treff*, 74 F.3d at 195; *see also Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995) (noting the party failed to depose other individuals who could have provided admissible evidence and upholding summary judgment where nonmovant sought instead to use inadmissible hearsay testimony in another deposition to avoid summary judgment). Thus, Mr. Elmore's breach of good faith and fair dealing claim fails to survive summary judgment.

### C. Tortious Interference with Contractual Relations

For tortious interference with existing contractual relations, a claimant must establish that the party against whom the claim is brought, "without justification or privilege to do so, induce[d] a third person not to perform a contract with another." *LensCrafters, Inc. v. Kehoe*, 282 P.3d 758, 767 (N.M. 2012) (quoting *Deflon v. Sawyers*, 137 P.3d 577, 583 (N.M. 2006)). New Mexico courts have also described the absence of justification and privilege as actions taken primarily "with an improper motive or through improper means." *Fikes v. Furst*, 81 P.3d 545, 551 (N.M. 2003).

When considering motive, "[t]he inquiry, in the end, should be to determine the party's primary motivation for the interference. If it was primarily improper, then the person has no privilege. If it was primarily proper, then liability should not attach." *Fikes*, 81 P.3d at 552–53. In *Fikes*, the court relied on a letter the defendant sent a publisher regarding the plaintiff's manuscript as evidence of the defendant's primary motive. *Id.* In the letter, the defendant threatened to sue the publisher for libel if the book was published, stating that the manuscript would "threaten serious damage to . . . [the defendant's] standing in the anthropological community, [his] ongoing career, and, not least, his livelihood." *Id.* at 547, 553. The court relied on the latter statement to show the defendant's motivation to protect his reputation. *Id.* at 553. The court mused that "it would not be surprising to discover that [the defendant] took

13

pleasure in [the plaintiff's] lost profits, given the history of [the parties'] contentious relationship," but noted that the evidence from the letter indicated a different primary motive. *Id.* Faced only with the plaintiff's assertion that the defendant's "animosity towards [the defendant was] self evident," the court determined that the plaintiff had not satisfied his burden to show that the defendant's primary motive was improper and upheld the district court's summary judgment. *Id.*

Improper means include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Fikes*, 81 P.3d at 553 (quoting *M & M Rental Tools, Inc. v. Milchem, Inc.*, 612 P.2d 241, 246 (N.M. Ct. App. 1980)). In *Fikes*, the defendant did not ultimately sue for libel after the plaintiff revised the book and published it with another firm. *Id.* The court refused to consider this as evidence of an unfounded suit because the book "appear[ed] to have been changed specifically for the purpose of making it 'libel-proof' before it was published . . . ." *Id.*

Here, Harvard's letter to Amazon belies no improper motive. Instead, the letter asserts Harvard's copyright claim, noting a good faith belief that Mr. Elmore was not authorized to use fifty photographs included in his book. (Doc. 178-6.) Additionally, the fact that Harvard suggested Mr. Elmore publish his manuscript in a magazine, and offered free Museum photographs for such a publication, indicates Harvard did not object to Mr. Elmore publishing elsewhere as long as he used appropriate photographs. (*See* Doc. 22-2.) This evidence, which is significantly more than that available in *Fikes*, satisfies Harvard's initial burden to show no genuine issue of material fact. *See Fikes*, 81 P.3d at 553.

In response, Mr. Elmore asserts that Harvard's effort to contract with another author provides a basis for improper motive to stop Mr. Elmore from publishing his book. (Doc. 223, at

11.)   The Court recognized that Mr. Elmore stated a plausible claim regarding this argument

when it ruled on Harvard's motion to dismiss Mr. Elmore's counterclaims.  (Doc. 137, at 12.)

The admissible evidence, however, does not support this claim.  Instead, the evidence indicates

only that Harvard pursued joint publication with Mr. Elmore and another author for the purposes

of upholding Harvard's standards in publishing the book.  (*See* Docs. 181, at 2 (Board decision

notes); 162-4 (O'Donnell's rationale for co-author).)   Mr. Elmore presents no evidence to

contradict Harvard's evidence that it would support publication of the manuscript elsewhere.

(*See* Doc. 22-2.)   Unlike *Fikes*, Mr. Elmore does not even proffer evidence of a "contentious

relationship" at that point, but rather only Harvard's general concern or wariness that Mr.

Elmore's scholarship was not appropriate for the Press.  (*See* Docs. 22-2; 162-3; 162-4; 181-1, at

2.)  *See Fikes*, 81 P.3d at 553.   Absent evidence to the contrary, Mr. Elmore fails to show a

genuine issue of material fact regarding Harvard's primary motive for requesting that Amazon

remove Mr. Elmore's book from its website.

    Mr. Elmore also cannot show that Harvard interfered with his contract with Amazon

through improper means.  Mr. Elmore asserts that Harvard's letter to Amazon was deficient and

contained material misrepresentations.  (*See* Doc. 223, at 11–12 (framing this argument as

evidence of improper motive).)   Unlike *Fikes*, however, Harvard actually initiated a suit on

copyright before sending its letter to Amazon.  (*See* Docs. 1; 178-6.)   Additionally, the Court

devoted a careful, twenty-four page order assessing Harvard's copyright claims.  (Doc. 165.)

The Court ultimately granted summary judgment because "[c]onsidering *only the protected*

*elements* . . . reasonable minds could not find substantial similarity between" the *Historic Hopi*

*Ceramics* photographs and Mr. Elmore's illustrations.  (*Id.* at 23 (emphasis added).)  Even so, the

legal question regarding which elements of *Historic Hopi Ceramics* receive copyright protection

15

was certainly debatable.   (*See id.* at 21–22 (relying on the "minimal creativity in the compilation" and resulting "thin protection" to analyze alleged infringement).   Undoubtedly, Harvard's suit for copyright infringement was not unfounded.  *Fikes*, 81 P.3d at 553.

Consequently, Harvard prevails on its motion to dismiss Mr. Elmore's claims for tortious interference with contractual relations.

### D.  Conversion

"Conversion is 'the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made."  *Muncey v. Eyeglass World, LLC*, 289 P.3d 1255, 1262 (N.M. 2012).

Mr. Elmore alleges Harvard "thwarted Mr. Elmore's ability to sell his work by causing Amazon . . . to remove the published manuscript from their website, claiming [the manuscript] as [Harvard's] own."  (Doc. 22 ¶ 32.)   Setting aside, for the purposes of this decision, the issue whether intellectual property rights qualify as personal property, [2] Mr. Elmore still cannot prevail on this claim.  The Court has determined that Mr. Elmore contractually relinquished, to Harvard, his right to distribute the photographs he took at the Museum.  (Doc. 265, at 17, 19.)  As Mr. Elmore had no right to distribute those photographs to the public, Harvard's exercise of dominion and control over that property right does not constitute conversion.  *See Muncey*, 289

---

[2] Some states may include intangible intellectual property as personal property, *see Paradigm All., Inc. v. Celeritas Techs., LLC*, 659 F. Supp. 2d 1167, 1189 (D. Kan. 2009),  while others may not, *see Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284, 1287 (D. Utah 2009).  New Mexico has not specifically resolved the issue, but likely does not include intellectual property as personal property.  *See Muncey*, 289 P.3d at 1260 (N.M. 2012) (considering a conversion claim only after determining that the property was not protected by copyright and clarifying that the conversion claim involved only the tangible item).

P.3d at 1262 (requiring "control over personal property belonging to another in . . . defiance of the owner's rights").

Mr. Elmore argues that Harvard cannot defeat his conversion claim because Harvard ultimately lost its copyright claim, upon which Harvard based its letter to Amazon. (Doc. 223, at 15.)  Resolution of this conversion claim, however, does not depend on a defense pursuant to the Digital Millennium Copyright Act.  Instead, Mr. Elmore simply fails to present evidence that would support a genuine issue of fact on the elements.  *See Celotex*, 477 U.S. at 322.  As Mr. Elmore did not own the rights to distribute the photographs he took at the Museum, he cannot prevail on an action against Harvard for precluding him from further distributing those photographs.  Summary judgment is, therefore, appropriate on this claim.

### E.  Punitive Damages

"[I]n general, 'the purpose of awarding [contract] damages is . . . compensation and not punishment.'" *Romero v. Mervyn's*, 784 P.2d 992, 999 (N.M. 1989) (quoting *Restatement (Second) of Contracts* § 355 comment a (1981)).  Moreover, as courts impose punitive damages "for punishment and not for reparation, *a positive element of conscious wrongdoing is always required.*" *Paiz v. State Farm Fire & Cas. Co.*, 880 P.2d 300, 308 (N.M. 1994) (quoting Charles T. McCormick, *Handbook of the Law of Damages* § 79, at 280–81 (1935)).

In this case, Harvard reimbursed Mr. Elmore for all expenses for his research visit based on the receipts he submitted. (Docs. 209-4, at 50:24–51:8.)  Harvard declined to reimburse Mr. Elmore for additional expenses that he incurred by using his American Express miles to purchase flights. (*Id.* at 51:15–25.)  Mr. Elmore has submitted no evidence that Harvard's refusal to reimburse him for these expenses was consciously wrongful.  *See Paiz*, 880 P.2d at 308 (requiring a positive element of conscious wrongdoing to award punitive damages in contract

claims).  Consequently, punitive damages would not be appropriate for Mr. Elmore's remaining claim.

## IV.    CONCLUSION

All of Mr. Elmore's remaining counterclaims except for his contract claim for $757 are dismissed on summary judgment.  Mr. Elmore's breach of the covenant of good faith and fair dealing cannot survive without evidence that Harvard acted with bad faith or denied Mr. Elmore the benefit of his contract by pursuing another contract with a different author to publish a book based on Mr. Elmore's research.  Mr. Elmore's tortious interference of contractual relations claim fails because Mr. Elmore cannot produce evidence that Harvard acted primarily with improper motive or by improper means.  Mr. Elmore also fails to produce evidence that Mr. Elmore owned rights to distribute the photographs in his book, and consequently his conversion claim cannot withstand summary judgment.  Lastly, Mr. Elmore produces no evidence that Harvard's denial of additional reimbursement based on American Express miles constituted conscious wrongdoing necessary for punitive damages.

THEREFORE,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment Dismissing Defendant's Remaining Counterclaims (Doc. 209) is **GRANTED in part and DENIED in part** and Plaintiff's Motion for Summary Judgment on Defendant's Damage Claims (Doc. 211) is **GRANTED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**